UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WALGREEN EASTERN CO., INC.,                 ) Case No. 11 60 JLT

Plaintiff,                                  )
                                            ) MAGISTRATE JUDGE Bowler
v.                                          )
                                            )
MAOLIS REALTY TRUST,                        )
                                            )                    RECEIPT # 65943
Defendant.                                  )                    AMOUNT $250
_____)                   SUMMONS ISSUED
                                                                 LOCAL RULE 4.1
                                                                 WAIVER FORM
                        **COMPLAINT**                            MCF ISSUED
                                                                 BY DPTY. CLK.
                       INTRODUCTION                              DATE 8/1/05

        In July 1992, plaintiff Walgreen Eastern Co., Inc. ("Walgreens") entered into a sixty (60)

year ground lease with Maolis Realty Trust ("Maolis") for a parcel of property located in Lynn,

Massachusetts. In accordance with the lease, Walgreens constructed an approximately 16,000

square foot building for its pharmacy on the premises. For thirteen years, Walgreens promptly

paid its monthly rent and its pro-rata share of taxes and expenses. In 2004, however, Maolis

apparently became disgruntled with the lease deal – which locked in Walgreen's rent for 60

years – and concocted a purported "default" in an effort to terminate the lease and take

possession of Walgreen's building. Specifically, Maolis resurrected an old issue as to whether

Walgreens was responsible for the costs of a parking lot attendant – *that Maolis itself had been

paying for years and had never billed Walgreens*. When Walgreens questioned the charges,

Maolis unilaterally declared the pharmacy in "default" of its lease, and demanded that Walgreens

either pay the charge or face eviction. Maolis' attempted scheme to take Walgreen's building

culminated in Maolis filing a summary process complaint in Lynn District Court. Walgreens
thereafter removed that case to this Court.

As detailed below, the alleged "default" manufactured against Walgreens is without merit
and is purely pretextual. Despite the fact the parking lot attendant has been on location since
approximately 2000, Maolis made no claim that Walgreens was responsible for that expense
until 2004. Indeed, after Walgreens received Maolis "default notice," Walgreens reached out to
Maolis and offered to pay 67% of Walgreens' alleged share of the expense, even though (1) the
Lease provides that Maolis is obligated to "supervise" the parking lot; and (2) the Lease does not
entitle Maolis to reimbursement of the costs of supervising the lot. Instead of responding to
Walgreens' offer as promised, however, Maolis instead waited for thirty days to lapse and then
sent Walgreens an alleged "termination notice and notice to quit." Even after Walgreens *paid*
the full amount requested under protest, Maolis responded that it would nonetheless "proceed
with the termination."

Walgreens brings this action against Maolis for declaratory judgment, specific
performance, breach of contract, breach of implied covenant of good faith and fair dealing,
common law fraud, abuse of process, and violations of M.G.L. c. 93A arising from Maolis'
unfair and deceptive efforts to declare Walgreens in default of its 60 year ground lease, evict the
pharmacy from the premises, and take possession of Walgreens' building.

## PARTIES

1.      Plaintiff Walgreen Eastern Co., Inc. ("Walgreens") is a New York corporation
with its principal place of business in Deerfield, Illinois.

2

2.      Defendant  Maolis Realty Trust ("Maolis") is organized under the laws of the

Commonwealth of Massachusetts with its principal place of business located in Lynn,

Massachusetts.

## JURISDICTION

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that

there is complete diversity between the parties and the jurisdictional amount exceeds \$75,000.

## FACTS

### The 60-Year Ground Lease

4.      On or about July 27, 1992, Walgreens entered into a sixty (60) year ground lease

with Maolis for property located at 21 Joyce Street in Lynn, Massachusetts (the "Lease").  (A

true copy of the Lease is attached hereto as Exhibit A).  Pursuant to the Lease, Walgreens

constructed a pharmacy on the premises.  The Lease provides that "title and ownership to the

building and all related improvements hereafter constructed by Tenant . . . . shall be vested in

Tenant." (Lease §8(a)).   Section 29 of the Lease also states, in part, that "[a]ny buildings or

improvements on the Leased Premises as of the expiration or termination date of this Lease shall

be deemed relinquished by Tenant to Landlord...." (Lease §29).

5.      Over the entire 60-year lease, Walgreens pays a fixed monthly base rent as

follows: years 0-10 \$5,350; years 10-20 \$6152.50; years 20-30 \$7,383; years 30-40 \$8,859.58;

years 40-50 \$11,056.66; and years 50-60 \$13,285.83 [Lease §3].  Walgreens also pays a pro-rata

share of the real estate taxes.  (Lease §4).

6.      Under the Lease, the Landlord is obligated to "provide, maintain, repair,

adequately light when necessary during Tenant's business hours, clean, properly remove snow

3

and ice from, *supervise*, and keep available the parking areas . . . (Lease §5(a)(1)) (emphasis added).

7.     Walgreens is responsible for paying its pro-rata share of certain specifically identified parking lot expenses: "Tenant shall . . . pay to Landlord a pro rata share of the cost of maintaining, repairing, replacing, landscaping, lighting and cleaning the above mentioned parking and other facilities," which are defined as "common area costs." (Lease §5(b)). Pursuant to the express terms of the Lease:

> The common area costs shall include (i) public liability insurance
> covering liability for death or bodily injury . . . and property insurance . . .
> (ii) snow and ice removal, resurfacing and resealing the parking areas
> and sidewalks, (iii) repair, maintenance and replacement of bike stands and
> curbs, (iv) repairs, maintenance and replacement of pylon signs, the common
> area drainage system, the common area lighting system, common area utility
> system and the cost of lighting the pylon signs, In addition, Tenant shall pay a
> prorata share of 5% of said common area costs as an administrative fee.

(Lease §5(b)).   In short, Maolis is obligated under the Lease to "supervise" the parking lot. However, any supervision costs incurred by Maolis are not considered "common area costs" to be paid by Walgreens, but are the responsibility of Maolis.

8.     At the end of each calendar year, Maolis is obligated within sixty (60) days to provide Walgreens "with a certified statement detailing an itemized subscription [sic] of all of such actual costs and expenditures and a determination of Tenant's actual pro rata share." (Lease §5(b)).

## Maolis' Pattern of Untimely and Sloppy Billing in Breach of the Lease

9.     In breach of the Lease, Maolis repeatedly failed to provide Walgreens with a certified statement of operating expenses within sixty days after the end of the calendar year. Instead, Maolis' practice was to bill Walgreens for charges that were allegedly incurred years

4

earlier, often without the required documentation. For example, by letter dated February 5, 1998, Maolis sent a default notice to Walgreens for allegedly failing to pay 1994 and 1995 operating expenses, *that were not billed by Maolis until November 26, 1997.* Walgreens responded by letter dated February 18, 1998 pointing out Maolis' accounting errors and misallocation of costs.

10. On September 1, 2004, Maolis again sent a default notice for the alleged failure to pay 2001-2003 operating expenses, *that were not billed until March 19, 2004.* The backup for these costs was requested by Walgreens, but never provided until September 20, 2004, weeks after this alleged "default" notice was sent. In its October 8, 2004 response letter, Walgreens pointed out Maolis' failure to abide by the terms of the Lease. After the backup was received, however, Walgreens nevertheless sent in the requested payment.

## Maolis' Efforts To Back Charge for Parking Lot Supervision and Manufacture A Default Against Walgreens

11. On March 19, 2004, Maolis billed Walgreens $51,074.18 for "costs to maintain the parking lot for the last four years." Over 50% this amount related to a charge that Maolis characterized as "parking lot supervision." As set forth above, however, parking lot supervision is the sole responsibility of Maolis, not Walgreens.

12. Maolis attempted to fix this gaffe by letter dated October 25, 2004, wherein its lawyer stated that the line item had been "mistakenly characterized as 'Parking Lot Supervision.'" Maolis continued: "[I]n fact, that expense each year was directly related to parking lot maintenance and repairs and should not have been separated out or characterized as such." Maolis also claimed that it had employed a "full time employee" who cleaned the

5

sidewalks and gutters, "monitor[ed] disturbances/notif[ied] police" "monitor[ed] . . . snow

removal" and "clean[ed] exterior and interior common areas, hallways and bathrooms."

13.    In the October 25th Letter, Maolis also conceded that no agreement had ever been

reached between the parties relating to the cost allocation of these services:

> It is, therefore, the Landlord's position that the expense of this person is a maintenance
> expense and clearly attributable to Walgreens pursuant to Section 5(b) of the Ground
> Lease Agreement. In addition, it is in Walgreens' best interest for the Landlord to
> continue to maintain the parking lot as such, *but if Wallgreens does not want*
> *maintenance at this level and is not prepared to pay for the same, the landlord will revert*
> *back to 1996 practice and procedure.*" (emphasis added).

Revealingly, Maolis did not claim that Walgreens was in breach of a material term of the Lease.

Rather, Maolis merely asserted that it would withhold the service if Walgreens did not pay for it.

14.    In response, Walgreens sent two letters, dated November 2 and November 9,

2004, noting that the parking lot attendant's alleged functions overlapped Walgreens existing

common area charges for which it was already paying Maolis. Walgreens also noted that the

attendant performed no "monitoring" of the snow removal. In fact, Walgreens made repeated

phone calls to secure snow removal services, and often Walgreens' own employees broke out the

shovels to clear the snow. Walgreens also noted that:

> your client has consistently violated the Lease Agreement which provides that
> Landlord must provide Tenant within 60 days after the end of each calendar year
> itemized descriptions of each cost. Instead, your client submits CAM
> reconciliations for several years at a time in clear violation of its Lease
> requirements. This makes reconciliation extremely difficult considering the vast
> time period which has elapsed from the date the costs were purportedly incurred.

15.    By letter dated December 15, 2004, the landlord again conceded that that it had no

right to unilaterally charge Walgreens for the parking lot attendant:

> it is our position that the expense of Ms. Vasquez is a maintenance expense clearly
> attributable to Walgreens pursuant to Section 5(b) of the Ground Lease Agreement. *In*
> *addition, it is in Walgreens best interest for the landlord to continue to maintain the*

6

*parking lot as we currently do, however, we will not continue do so if this issue does not get resolved fairly and expeditiously.*

16.     In a good faith effort to resolve this issue, Walgreens reached out to the Landlord. Maolis insisted that the Lease required Walgreens to pay for all common area costs that Maolis had back charged, even for cleaning interior office space next to the pharmacy – a service for which Walgreens was not obligated to pay under the Lease. Walgreens pointed out that such costs were not "common area costs" under the Lease. Walgreens again noted that supervision of the parking lot was the responsibility of Maolis. Nevertheless, in a good faith effort to resolve the issue, Walgreens offered to pay 2/3 of its alleged share of the costs. Maolis agreed to consider the offer. As described below, however, Maolis never responded to the offer and instead sent default notices seeking to wrongfully terminate the Lease and to take possession of Walgreens' building.

## Maolis' Purported Default Notices

17.     On April 26, 2005, Landlord sent Walgreens a "notice of default" under the Lease for failing to pay $12,284.67 in "additional charges due under the lease for [common area costs] and insurance for the calendar year 2004." (A copy of the April 26th letter is attached hereto as Exhibit B). Maolis also claimed a $4,094.88 "underpayment" for monthly [common area costs] and insurance escrow accounts for January through April 2005. All of these alleged "underpayments," of course, relate to the disputed parking lot attendant charges.

18.     On May 6, 2005, Walgreens responded by noting that "there is still a discrepancy concerning the payments of charges relating to [the parking lot attendant]." Walgreens also requested a "response to Walgreens most recent offer of 2/3 payment for [the parking lot attendant] charges." (A copy of the May 6th letter is attached hereto as Exhibit C).

7

19.     By letter dated May 10, 2005, Walgreens sent Maolis a check for $4,131.57 for the 2004 common area costs and insurance. Walgreens reached this figure by deleting the parking attendant charges.

20.     On May 12, 2005, Maolis sent Walgreens a second notice of default, this time seeking to retroactively charge Walgreens for the parking lot attendant for the years 2001 through 2003. (A copy of the May 12th notice is attached hereto as Exhibit D).

21.     On June 1, 2005, Maolis sprung its trap on Walgreens, stating that the Lease was "terminated" because Walgreens did not "cure the defaults" set forth in its letter of April 26, 2005. The sole basis for the alleged lease termination was Walgreens' refusal to pay the parking lot attendant charges. (A copy of Maolis' purported termination notice and notice to quit is attached hereto as Exhibit E).

22.     Walgreens, however, continued to reach out to the Landlord to resolve the disputed common area charges for the parking lot attendant. In a June 6, 2005 telephone conference, Walgreens suggested that the parties enter into an amendment to specifically outline the parking lot functions. At the end of the discussion, Walgreens believed Maolis was amenable to the idea.

23.     Instead, by notice dated June 17, 2005, Maolis sent a third default letter, claiming another "underpayment of CAM and insurance escrow" of $1,023.72 [again relating to the parking lot attendant] for June 2005, and real estate taxes of $7,293.51 "for the period April 1, 2005 –June 30, 2005."

24.     Demonstrating Maolis' bad faith, the real estate tax bill was not even sent to Walgreens until May 19, 2005, less than thirty days before the default notice. In fact, Walgreens

8

actually paid the invoice of $7,293.51 on June 17, 2005 – the day the default notice was prematurely sent.

25.    In short, despite the fact that (i) Walgreens had no obligation under its Lease to reimburse the Landlord for any "supervision" of the parking lot; (ii) Maolis did not seek to charge Walgreens for parking lot supervision for several years; (iii) Maolis had repeatedly failed to certify and bill Walgreens for parking lot operating costs as required under the Lease; (iv) Walgreens offered to pay 67% of the parking lot attendant's costs, Maolis filed in bad faith a summary process action in Lynn District Court on June 20, 2005 seeking to evict Walgreens for failing to pay the disputed amount of common area costs. Further demonstrating the Landlord's bad faith, Maolis included in its summary process action a claim for failure to pay the second quarter real estate taxes of $7,239.51, which was not overdue and had been paid days earlier.

26.    After the summary process complaint was served, Walgreens reached out yet again to Maolis to resolve the parking lot attendant issue by offering to enter into a lease amendment that specified the charges that Walgreens would incur. Walgreens also offered to pay 100% of the 2004-2005 charges as a showing of good faith. Exposing the pre-textual nature of the alleged "defaults," Maolis, refused Walgreen's offer and said it would instead proceed with the eviction action.

27.    To avoid any misunderstanding as to its good faith, Walgreens thereafter sent to Maolis a check for the entire amount sought in the summary process action (less the real estate taxes previously paid) marked "under protest." Notwithstanding payment of the full amount sought, Maolis persists in its efforts to terminate the Lease.

9

## Count I
### (Declaratory Judgment – 28 U.S.C. § 2201 et seq.)

28.     Walgreens repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

29.     There is an actual controversy between Walgreens and Maolis concerning Walgreens' rights under the Lease, including Walgreens' payment obligations under the Lease and Walgreens' right to use and occupy the premises.

30.     Walgreens seeks a declaration that it has performed all of its obligations under the Lease and has not breached the Lease.

31.     Walgreens seeks a declaration that Maolis is responsible for all costs associated with supervision of the parking lot pursuant to the Lease, including payment for the parking attendant.

32.     Walgreens seeks a declaration that it is entitled to continuous use and occupancy of the premises pursuant to the Lease through its expiration date.

## Count II
### (Specific Performance)

33.     Walgreens repeats, realleges, and incorporates by this reference the allegations contained in the preceding paragraphs.

34.     The Lease grants Walgreens the right to use and occupy the premises for a term of 60 years.

35.     Maolis has wrongfully sought to evict Walgreens from the premises in breach of the Lease.

36.     Walgreens is ready, willing and able to do and perform all acts and things necessary by it to be done under the terms of the Lease.

10

37.     As a result, Walgreens is entitled to specific performance of the Lease.

## Count III
### (Breach of Contract/Lease)

38.     Walgreens repeats, realleges, and incorporates by this reference the allegations

contained in the preceding paragraphs.

39.     As detailed above, Maolis' actions constitute multiple breaches of the Lease.

40.     As a result, Walgreens is entitled to damages, in an amount to be proven at trial,

plus interest, costs, and attorneys' fees.

## Count IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

41.     Walgreens repeats, realleges, and incorporates by this reference the allegations

contained in the preceding paragraphs.

42.     As set forth above, Maolis has breached the implied covenant of good faith and

fair dealing contained in the Lease.

43.     As a result, Walgreens is entitled to damages, in an amount to be proven at trial,

plus interest, costs, and attorneys' fees.

## Count V
### (Common Law Fraud)

44.     Walgreens repeats, realleges, and incorporates by this reference the allegations

contained in the preceding paragraphs.

45.     Maolis defrauded Walgreens by, among other actions, improperly billing

Walgreens for charges for services provided by the parking lot attendant, accusing Walgreens of

a default under the Lease by failing to pay for the parking attendant charges, serving Walgreens

11

with default and termination notices and filing in the bad faith summary process action against
Walgreens - - all in an effort to terminate the Lease and take possession of Walgreens' building.

46. As a result, Walgreens is entitled to damages, in an amount to be proven at trial,
plus interest, costs, and attorneys' fees.

## Count VI
## (Abuse of Process)

47. Walgreens repeats, realleges, and incorporates by this reference the allegations
contained in the preceding paragraphs.

48. Maolis utilized process with the filing of the summary process action against
Walgreens.

49. The summary process action was filed for the improper purpose of seeking to
terminate the Lease, evict Walgreens from the premises and take Walgreens' building based on
purported defaults that have no basis in fact or law.

50. The process was used for an ulterior purpose for which it was not designed or
intended.

51. As a result, Walgreens is entitled to damages, in an amount to be proven at trial,
plus interest, costs, and attorneys' fees.

## Count VII
## (Violations of M.G.L. c. 93A)

52. Walgreens repeats, realleges, and incorporates by this reference the allegations
contained in the preceding paragraphs.

53. At all relevant times, Walgreens and Maolis were engaged in trade or commerce
within the meaning of M.G.L. c. 93A.

54.     As set forth above, Maolis committed knowing and willful violations of M.G.L. c.

93A against Walgreens.

55.     Maolis' unfair and deceptive actions occurred primarily and substantially in

Massachusetts.

56.     As a result, Walgreens is entitled to damages in an amount to be proven at trial,

plus multiple damages, interest, costs, and attorneys' fees.

## **REQUESTS FOR RELIEF**

WHEREFORE, Walgreens respectfully requests that the Court:

A.      Under Count I, declare that: (i) Maolis is responsible for all costs associated with supervision of the parking lot under the Lease, including payment for the parking attendant; and, (ii) Walgreens is entitled to continuous use and occupancy of the premises pursuant to the Lease through its expiration date.

B.      Under Count II, order that Maolis be required specifically to perform under the Lease, including but not limited to, not interfering with Walgreens' right to use and occupy of the premises;

C.      Under Counts III – VI, enter judgment in favor of Walgreens and against Maolis in an amount to be proven at trial;

D.      Under Count VII, enter judgment in favor of Walgreens and against Maolis in an amount to be determined at trial as a result of the unfair and deceptive acts or practices of defendant, plus award statutory punitive damages equal to two or three times the amount of plaintiff's actual damages;

E.      Award prejudgment interest, costs and reasonable attorneys' fees; and,

13

F.    Award such other relief as the Court deems just and proper.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

WALGREEN EASTERN CO., INC.

By its attorneys,

_____

Joel G. Beckman (BBO #553086)
William C. Nystrom (BBO#559656)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
Dated: July 29, 2005                (617) 778-9110 (fax)

14

# EXHIBIT A

LYNNMA.RED/240
12/16/9.

### GROUND LEASE AGREEMENT

By this Lease, made in multiple counterparts the <del>19th</del> as of 27th day of <del>January</del> , 1992, between GORDON HALL III AND JOHN RYDER, as Trustees of MAOLIS REALTY TRUST, under Declaration of Trust dated September 24, 1979, and registered with the Essex County, Southern District of the Land Court, as Document No. 172007, hereinafter referred to as "Landlord", and WALGREEN EASTERN CO., INC., a New York corporation, hereinafter called "Tenant",

1.    For and in consideration of the rentals hereinafter reserved and the covenants and agreements herein contained, Landlord does hereby demise and lease unto Tenant, and Tenant does hereby lease from Landlord, the real property located in the City of Lynn, Commonwealth of Massachusetts, as legally described on Exhibit "A" attached hereto and made part hereof and as shown outlined in red on the plan attached hereto and made a part hereof as Exhibit "B" (hereinafter referred to as "Leased Premises"), together with all improvements, appurtenances, easements and privileges belonging thereto, for the term, at the rentals, and upon the covenants and conditions hereinafter stated.

2.    Term

(a)    The Term of this Lease shall commence on the Lease Commencement Date as defined in Section (b) of this Article and shall continue for sixty (60) years following Tenant's Opening Date as defined in Section (c) of this Article provided, however, if such Tenant's Opening Date shall be other than the first day of the calendar month then the term shall continue to and include the last day of the same calendar month of the sixtieth (60th) year thereafter.

(b)    The Lease Commencement Date shall commence either on the date (i) that all of the conditions, approvals, permits, licenses, exceptions, zoning and improvements required under Section (d) of Article 8, all of the conditions under Article 9 and all of the conditions under Article 11 of this Lease have been obtained, performed, or fulfilled (as evidenced by written notice from Tenant), or on the date (ii) Landlord has put Tenant into exclusive physical possession of the Leased Premises, whichever is the last to occur.  Landlord shall give Tenant notice that it shall tender possession of the Leased Premises not later than 30 days prior thereto.  Tenant shall employ reasonable efforts to satisfy itself as to all matters referred to in (i) above within the time periods stated in connection therewith in this Lease.  Such efforts shall be at Tenant's cost and expense (except as provided for herein).  If the Lease Commencement Date has not commenced within one year from the date of this Lease Agreement, Tenant may cancel this Lease, by sending notice to Landlord within ninety (90) days after the expiration of the abovementioned one year period.  In addition, if the Lease Commencement Date has not commenced within one (1) year from the date of this Lease and Landlord has fully complied with all conditions on the

(This Instrument Prepared by Anthony C. Sgarlata, 200 Wilmot Road, Deerfield, Illinois 60015)

part of Landlord under this Lease, Landlord may cancel this Lease by sending notice to Tenant no later than ninety (90) days after the expiration of the above mentioned one (1) year period. If the Lease Commencement Date shall not occur within twenty-one years from the date of this Lease, this Lease and the terms hereof shall terminate.

(c) Tenant's Opening Date shall be the date Tenant shall open for business in the building described in Article 8 of this Lease, which opening shall not be later than five months after the Lease Commencement Date as above provided subject to extension equal to any delays occasioned by strikes, casualties, governmental restrictions, priorities or allocations, inability to obtain materials or labor, denial of licenses to conduct its business or other causes beyond Tenant's control (not to exceed six (6) months); but Tenant shall have no liability for failure to open its store within said period except that Tenant's Opening Date shall be deemed to be the date Tenant should have opened for business.

(d) Tenant shall have the right and option, at Tenant's election, to terminate this Lease effective as of the last day of the 180th full calendar month following Tenant's Opening Date, effective as of the last day of the 240th full calendar month following Tenant's Opening Date, effective as of the last day of the 300th full calendar month following Tenant's Opening Date, effective as of the last day of the 360th full calendar month following Tenant's Opening Date, effective as of the last day of the 420th full calendar month following Tenant's Opening Date, effective as of the last day of the 480th full calendar month following Tenant's Opening Date, effective as of the last day of the 540th full calendar month following Tenant's Opening Date, effective as of the last day of the 600th full calendar month following Tenant's Opening Date and effective as of the last day of the 660th full calendar month. If Tenant shall elect to exercise such option, Tenant shall send written notice thereof to Landlord at least nine months prior to the date this Lease shall so terminate, but no notice shall be required to terminate this Lease upon the expiration of the full term. Options referenced in this Section shall not be considered options to extend the term of the Lease.

3.    Rent

Tenant shall pay rent for the Leased Premises as follows:

(a) (i) A rent of $5,350.00 per month commencing on Tenant's Opening Date and continuing to and including the last day of the 120th full calendar month following Tenant's Opening Date;

(ii) A rent of $6,152.50 per month commencing on the first day of the 121st full calendar month following Tenant's Opening Date and continuing to and including the last day of the 240th full calendar month following Tenant's Opening Date;

(iii) A rent of $7,383.00 per month commencing on the first day of the 241st full calendar month following

Tenant's Opening Date and continuing to and including the last day of the 360th full calendar month following Tenant's Opening Date;

(iv)  A rent of $8,859.58 per month commencing on the first day of the 361st full calendar month following Tenant's Opening Date and continuing to and including the last day of the 480th full calendar month following Tenant's Opening Date;

(v)  A rent of $11,056.66 per month commencing on the first day of the 481st full calendar month following Tenant's Opening Date and continuing to and including the last day of the 600th full calendar month following Tenant's Opening Date;

(vi)  A rent of $13,285.83 per month commencing on the first day of the 601st full calendar month following Tenant's Opening Date and continuing thereafter for the remainder of the term.

Rent shall be payable on the first day of each and every month in advance and shall be properly apportioned for any period less than a full calendar month.

(b)  Until further notice to Tenant, checks for rent and other charges shall be payable to and mailed to:

Maolis Associates
P.O. Box 37
Nahant, Massachusetts  01908

4.  <u>Taxes</u>

(a)  Landlord shall pay all real estate taxes and assessments levied and assessed against the Leased Premises and the area outlined in green on attached Exhibit "B" (hereinafter called "Parcel 2")prior to delinquency.  Tenant shall, from time to time during the term of this Lease commencing on Tenant's Opening Date, and upon request of Landlord (sent to Tenant's Tax Department or as otherwise directed by Tenant) accompanied by a bill or photocopy thereof, pay to Landlord the real estate taxes levied and assessed against any building constructed by Tenant on the Leased Premises.  Furthermore, Tenant shall, from time to time, during the term of this Lease commencing on Tenant's Opening Date, and upon request of Landlord (sent to Tenant's Tax Department or as otherwise directed by Tenant) accompanied by a bill or photocopy thereof, pay to Landlord a pro rata share of the real estate taxes levied and assessed against the land within the Leased Premises and the land within Parcel 2.    Landlord shall provide Tenant with a proof of timely payment of such real estate taxes within thirty (30) days after the date said taxes are due and owing to the taxing authority.  If Landlord fails to provide proof of payment of such taxes within the period referenced above, the rent payable under Article 3 above shall be withheld by Tenant until such time that Landlord provides satisfactory proof of payment.  Tenant's pro rata share of such taxes shall be an amount equal to the total cost of such taxes multiplied by a fraction, the numerator of which shall be the square foot floor area of the first floor plus fifty percent (50%) of the square foot floor area of the second

floor of any building on the Leased Premises and the
denominator of which shall be the square foot floor area of
the first floor plus fifty percent (50%) of the square foot
floor area of the second floor of all buildings in the
Leased Premises and Parcel 2.

It is understood that any increase in such taxes by
reason of improvements made to any building on Parcel 2
shall not be chargeable to Tenant under this Article, and it
is further understood that any liability hereunder for any
period in which the term of this Lease shall not cover an
entire tax year shall be properly prorated.

(b)   Nothing herein contained shall be construed as
requiring Tenant to pay any so called income or profit taxes
assessed upon it in respect of the income of Landlord or any
income or profit taxes, corporation tax, franchise tax,
capital stock tax or other taxes chargeable to or required
to be paid by Landlord, nor shall anything in this Lease
contained be construed to require Tenant to pay any so
called inheritance, bequest, estate, succession or transfer
tax growing out of any inheritance, devise, transfer or gift
reversion of said parcel of land.  In the event that any
governmental authority imposes a tax, charge, assessment or
other imposition upon tenants in general which is based upon
the rent payable under this Lease (or which is imposed upon
landlords and said governmental authority permits landlords
to pass such tax on to their tenants), Tenant shall pay the
same to said governmental authority or to Landlord if
Landlord is responsible to collect the same (in which case
Landlord shall remit the same in a timely manner and, upon
request of Tenant, evidence to Tenant's said remittance).

(c)   If Landlord fails to pay any taxes or assessments
which are Landlord's obligations pursuant to this Lease, for
thirty (30) days after receipt of notice from Tenant, Tenant
shall then, but not until then, have the right to make such
payment or payments and Landlord shall reimburse and pay
Tenant any amount so paid (in excess of Tenant's pro rata
share of such costs) with interest thereon at the maximum
lawful rate from the date of payment so made until repaid by
Tenant.  If Landlord shall then fail to pay such sum due to
Tenant, Tenant shall have the right and is hereby
irrevocably authorized and directed to deduct such sum from
rent and other charges due Landlord.

(d)   Tenant and/or such sub-tenant as Tenant shall
hereafter designate, shall have the right to contest the
validity or the amount of any tax or assessment levied
against the Leased Premises or any improvements thereon,
provided that neither Tenant nor any such sub-tenant shall
take any action which will cause or allow the institution of
foreclosure proceedings or the imposition of a lien or levy
against the Leased Premises. Landlord, without cost to
Landlord shall reasonably cooperate in the institution of
any such proceedings to contest the validity or amount of
real estate taxes and will execute any documents required
therefor.

Landlord covenants and agrees that if there shall be
any refunds or rebates on account of any tax, governmental
imposition, levy, or special or general assessments paid by
Tenant under the provisions of this Lease, such refund or

-4-

rebate shall belong to and become the property of Tenant.
Any such refunds or rebates (less the cost of obtaining the
same) ("net rebate") which shall be received by Landlord
shall be trust funds in the possession of the Landlord and
shall be forthwith paid to Tenant.  Landlord shall, on
request of Tenant, sign any receipt which may be necessary
to secure the payment of any net rebate, and shall pay over
to Tenant such net rebate as received by Landlord.

5.    Parking

        (a)  (i)   Subject to section (a)(ii) below, Landlord
covenants that at all times during the term of this Lease,
Landlord shall provide, maintain, repair, adequately light
when necessary during Tenant's business hours, clean,
properly remove snow and ice from, supervise and keep
available the parking areas located within the Leased
Premises and Parcel 2, as shown on Exhibit "B" (which
parking areas shall provide for the parking of at least 123
automobiles), and also adequate common areas, and other
facilities appurtenant thereto.  Said parking areas shall be
for the free and exclusive use of customers, invitees and
employees of Tenant and the occupants of Parcel 2.  There
shall be no changes in the grade elevations in the parking
areas which exceed 5%, and such parking areas shall be
suitably paved and drained.  There shall be no steps or
ramps in the sidewalk except as shown on Exhibit "B," and
except for handicapped ramps required by governmental
authorities.  The Leased Premises parking area shall have
automobile entrances and exits from and to adjacent streets
and roads, which said entrances and exits shall be of such
size and at such locations as shown on Exhibit "B."
Automobile traffic aisles in the parking area shall run in
the direction on Exhibit "B."

        (ii)   Notwithstanding Article 5(a)(i), Tenant, at
Tenant's expense shall have the right to construct a full
access entrance and exit in the area identified as "new
entrance and exit" and such parking areas as shown
crosshatched in red on attached Exhibit "B."

        (iii)   Landlord shall have the right to designate
certain areas on Parcel 2, reasonably acceptable to Tenant,
for employee parking.  Tenant shall use good faith efforts
to require Tenant's employees to park in such areas
designated "employee parking."

        (iv)   Landlord has executed and recorded a certain
Easement Agreement With Use Restrictions dated December 20,
1991, hereinafter referred to as "said Easement Agreement,"
in which Tenant, its customers, employees, agents, invitees,
successors and assigns have been granted the non-exclusive
easement and right to use the walkways and driveways located
within Parcel 2 and the right to park motor vehicles on
those portions designated for parking within said Parcel 2.
The Parking Areas in Parcel 2 shall be for the free and
exclusive use of Tenant, and the customers, invitees and
employees of Tenant and occupants of Parcel 2.  In addition,
said Easement Agreement imposes certain building
restrictions and exclusive business rights and restrictions
including the exclusive use restrictions contained in
Article 12 of this Lease.  Said Easement Agreement also
provides that Landlord has granted to Tenant a non-exclusive

right to enforce all rights, covenants and agreements
granted Tenant pursuant to said Easement Agreement to
provide, maintain, repair, light, clear, keep available the
Parking Areas and also adequately service the receiving
areas, pedestrian walks, sidewalks, curbs, roadways and
facilities appurtenant thereto.  Furthermore, without
limiting the generality of the foregoing, Landlord has
granted to Tenant a non-exclusive right to enforce all
covenants contained in said Easement Agreement that provide
that no barriers or obstructions shall be erected to close
off Parcel 2 from the Leased Premises.  In addition,
Landlord has assigned to Tenant the right to enforce the
above-mentioned building and exclusive use restrictions
contained in said Easement Agreement.  The Easement
Agreement shall not be subject to any lien, encumbrance,
mortgage or any other type of restriction without the
express written approval of Tenant.  It is understood and
agreed that Landlord shall not enter into any agreement
modifying said Easement Agreement which would (i) modify the
parking areas and aisles of Parcel 2 (ii) modify the
entrances and exits of Parcel 2; (iii) modify the use and
building restrictions, or (iv) make any other change which
would modify Tenant's rights under this Lease, without
Tenant's written consent.

          (v)    If for any reason Tenant, its customers,
employees, agents, invitees, successors and assigns are
denied the right to use the walkways and driveways located
within Parcel 2, or are denied the right to park motor
vehicles on those portions designated for parking within
said Parcel 2 (as set forth in the Easement Agreement), as a
result of any act or omission of Landlord or the owner of
Parcel 2, Tenant shall have the right after notice of such
default, in addition to other remedies available to Tenant
under this Lease, including the right to injunctive or other
equitable relief, the right to either (i) terminate this
Lease by giving notice to Landlord (as provided in Article
19 hereof) or (ii) pay as rent, in lieu of that provided in
Article 3(a) of this Lease, an amount equal to one-half of
the fixed monthly rent set forth in Section (a) of Article
3.  In addition, Tenant shall not be obligated to pay any
other charges otherwise required to be paid under this
Lease.  Tenant shall recommence paying rents and other
charges under this Lease as of the date that all such
defaults have been fully cured.  Tenant shall not be
obligated to pay any amounts which would have been payable
during said parking lot defaults.

          (b)    Tenant shall, from time to time during the Term
of this Lease commencing on Tenant's Opening Date, pay to
Landlord a pro rata share of the cost of maintaining,
repairing, replacing, landscaping, lighting and cleaning the
above mentioned parking and other facilities ("common area
costs").  The common area costs shall include (i) public
liability insurance covering liability for death or bodily
injury in any one accident, mishap or casualty in a sum of
not less than $1,000,000.00 and property insurance in any
one accident, mishap or casualty in an amount not less than
$100,000.00 (the amount of such insurance coverage shall not
be excess of that which is commercially reasonable for
shopping centers of the same type as Parcel 2 and the Leased
Premises), (ii) snow and ice removal, resurfacing and
resealing the parking areas and sidewalks, (iii) repair,

"supervise"
and
"security"
not listed

-6-

maintenance and replacement of bikestands and curbs, (iv) repairs, maintenance and replacement of pylon signs, the common area drainage system, the common area lighting system, common area utility system and the cost of lighting the pylon sign. In addition, Tenant shall pay a pro rata share of 5% of said common area costs as an administrative fee. Tenant's share shall be paid monthly. During the first year of the Lease Term, said monthly payment shall be $467.50. Within sixty (60) days after the end of each calendar year, Landlord shall supply Tenant with a certified statement detailing an itemized subscription of all of such actual costs and expenditures and a determination of Tenant's actual pro rata share. In the event that the amount previously paid by Tenant is less than its actual pro rata share, Tenant shall pay the balance within forty-five (45) days of Tenant's receipt of statement. In the event Tenant has overpaid its pro rata share of such costs, Landlord shall immediately refund the excess payment to Tenant. Tenant's monthly payment for all subsequent years shall be 1/12 of Tenant's actual pro rata share of such charges for the previous year. All bills shall be submitted for payment to the Accounting Department of Tenant or as otherwise directed by Tenant. Tenant's share shall be in the same proportion to the total cost as the square foot floor area of the first floor plus fifty percent (50%) of the square foot floor area of the second floor in the building located in the Leased Premises is to the square foot floor area of the first floor plus fifty percent (50%) of the square foot floor area of the second floor of all buildings in the Leased Premises and Parcel 2. If Tenant shall remain open later than 11:00 P.M., then Tenant shall, from time to time, when billed by Landlord, but not more often than once each calendar quarter, pay to Landlord a pro rata share of the cost of lighting the parking lot during such time ("after hours lighting"). Tenant's pro rata share thereof shall be equal to the total cost of such after hour lighting multiplied by a fraction, the numerator of which shall be the square foot floor area of the building located on the Leased Premises and the denominator of which shall be the square foot floor area of all businesses in Parcel 2 and the Leased Premises regularly open for business later than 11:00 P.M.

6.    Insurance

Tenant shall carry public liability insurance in amounts not less than $3,000,000.00 as to bodily injury and $300,000.00 as to property damage in any one occurrence with respect to occurrences on the Leased Premises. Landlord shall be named as an additional insured under said insurance coverage. Notwithstanding the foregoing, Tenant agrees to increase such insurance coverage to amounts which are commercially reasonable for retail operations of the same type as the Leased Premises. However, Tenant may carry such insurance pursuant to Master Policies of Insurance (including deductibles contained therein) covering other locations of Tenant or its corporate affiliates. In addition, if Tenant and/or the guarantor of this Lease has a net worth of not less than $50,000,000.00, Tenant may self-insure in the above amounts.

LYNNMA.RED/249

7.   Easements

Landlord shall execute upon request therefor by Tenant such easements and right of ways as Tenant shall reasonably require for the construction of a building on the Leased Premises and for the purpose of connection to and use of existing and future drainage and utility facilities (including but not limited to water, gas, telephone, and electric lines, storm drainage, sanitary sewer systems and surface drainage) located over, under, and across the Leased Premises. Notwithstanding anything to the contrary contained herein, Landlord shall not be required to execute easements and right-of-ways if such easements and/or right-of-ways interfere with the common use of the Parking Areas.

8.   Construction

(a)   Tenant shall construct a building on the Leased Premises and other facilities in accordance with Tenant's plans and specifications. Title and ownership to the building and all related improvements hereafter constructed by Tenant and any subsequent or further improvements, modifications and additions on the Leased Premises shall be vested in Tenant or it assigns, except as provided for herein. Any building constructed by Tenant (or anyone claiming under Tenant) on the Leased Premises will be located within the area identified as Building Area on Exhibit "B." Furthermore, such building shall not exceed one (1) story. In addition, the storefront of the building constructed on the Leased Premises shall be architecturally harmonious with the buildings located on Parcel 2.

(b)   After Tenant receives necessary building permits, Tenant shall give Landlord notice that possession of the Leased Premises may be delivered to Tenant. Landlord shall deliver said possession not later than 75 days after its receipt of Tenant's notice. Tenant is authorized to demolish all existing buildings, structures and improvements located on the Leased Premises, to remove, raze, and destroy such trees, plants, shrubs, and topsoil as Tenant may deem necessary, to excavate and remove earth from the Leased Premises in such quantities necessary to complete Tenant's construction hereunder. Tenant shall properly dispose of any asphalt excavated by Tenant in Tenant's construction of its building on the Leased Premises.

(c)   All work to be performed by Tenant shall be performed in a good and workmanlike manner, in accordance with all rules, regulations, codes and ordinances of any local, municipal, state and federal authority having jurisdiction thereof. Tenant shall not permit any mechanics' or other liens to stand against the property for work or material furnished Tenant and Tenant shall indemnify Landlord against any such liens.

(d)   Tenant shall use reasonably diligent efforts to obtain from the authorities having jurisdiction thereof and bear the costs thereof of (i) building permits, plan of development approvals, (ii) special exceptions, variances, curb cuts and driveway approvals, licenses (excepting business licenses and permits) and permits required for all construction referred to in this Article and for the use of the building to be constructed on the Leased Premises, including the permits to connect Tenant's utilities to

-8-

LYNNMA.RED/240

public services, (iii) such zoning approvals, variances and permits required to construct and utilize the Leased Premises for a drug store use with a prescription pharmacy. All of said approvals, licenses, and permits shall relate to the construction and use of a commercial building for retail use and must be in such form as to be reasonably acceptable to Tenant.  If Tenant fails to obtain such necessary approvals, licenses and permits within 180 days after the date of full execution of this Lease (unless said period shall have been further extended by mutual agreement), Tenant shall have the right and option to cancel this Lease upon written notice to Landlord at any time after the expiration of such 180 day period (or any applicable extension thereof, as the case may be).  In addition, if Tenant fails to obtain such necessary approvals, licenses and permits within 180 days after the date of full execution of this Lease (unless said period shall have been further extended by mutual agreement), and Landlord has fully complied with all conditions on the part of Landlord under this Lease, Landlord shall have the right to cancel this Lease by sending written notice to Tenant within  ninety (90) days after the expiration of such 180 day period (or any applicable extension thereof, as the case may be).   In the event and upon the exercise of the right of cancellation hereunder, this Lease shall be terminated and of no further force and effect, and the parties hereto shall be relieved of all liability hereunder or otherwise to each other.

     (e)   INTENTIONALLY OMITTED

     (f)   INTENTIONALLY OMITTED

     (g)  Notwithstanding any other provision, it is an express condition of this Lease, that Tenant shall have the right to display a sign on the existing Shopping Center pylon sign.  No other tenants' sign on the pylon sign may be larger than Tenant's sign.  The foregoing statement shall

(HERE ENDS THIS PAGE)

not apply if Tenant elects not to install a sign on the
existing Shopping Center pylon sign.

9.    Conditions

This Lease, and each of Tenant's covenants, duties and
obligations, are expressly subject to and contingent upon
the following: (a) that the Leased Premises are properly
zoned to permit the use for a free standing drug store with
a prescription pharmacy and with parking facilities, in
accordance with Tenant's plan and specifications, and that
there are no restriction of record which will prohibit such
use, (b) that public water, sewer and storm drainage are
available at the Lease Premises in accordance with the
rules, regulations and ordinances of applicable governmental
authority, all in the quantity and capacity as specified by
Tenant, without the necessity of holding tanks or like
mechanisms or equipment, and (c) electricity, gas, telephone
and all other utilities (including all items referred to in
this Section) required by Tenant to serve the Leased
Premises shall be available at one of the property lines of
the Leased Premises without off-site improvements pump or
lift stations being required.

10.    Compliance With Laws

(a)    Tenant covenants and agrees that during the term
of this Lease (and any holdover period), Tenant shall
promptly comply with all present and future laws,
ordinances, orders, rules, regulations, and requirements of
the federal, state, county, city, and municipal governments
or any of their departments, bureaus, boards, commissions
and officials thereof with respect to the Leased Premises,
the buildings and improvements thereon or hereafter erected
thereon by Tenant, or the use or occupancy thereof, whether
said compliance shall be ordered or directed to or against
Landlord or Tenant or both, except to the extent that
Landlord has any obligations under this Lease and except to
the extent that any of the foregoing result from
circumstances which comprise a breach of any of Landlord's
warranties under this Lease.

(b)    Tenant, at its sole expense, shall have the right,
after prior written notice to Landlord, to contest by
appropriate legal proceedings which shall be conducted
diligently and in good faith in the name of Landlord or
Tenant or both and without cost or expense to Landlord, the
validity or applicability of any law, ordinance, order,
rule, or regulations of the nature hereinabove referred to
in this Article 10, and Tenant shall have the right to delay
compliance thereof until such contest is finally determined
and is no longer subject to appeal, provided that such
compliance may be legally delayed without subjecting
Landlord to any criminal liability.

11.    Tests, Surveys and Easements

(a)    Landlord hereby and as of the date of this Lease
grants to Tenant and its agents and representatives the full
right of access to the Leased Premises and Tenant may
through its agents and representatives inspect the Leased
Premises, and conduct such other investigations as Tenant
may require.  Tenant shall indemnify and hold Landlord

harmless as a result of any negligent act of Tenant's agents occurring during their investigation of the Leased Premises. In addition, Tenant shall substantially restore the surface of the Leased Premises disturbed by Tenant, Tenant's agents and Tenant's representatives, if this Lease is terminated prior to the Lease Commencement Date.

(b)  Landlord has delivered to Tenant an Environmental Report dated July 8, 1991, ("environmental update"), prepared by New England Environmental Testing Corporation, updating that certain Environmental Report dated July 14, 1988, prepared by said environmental company.  Said environmental update reveals the presence of toxic and hazardous materials or substances in the soil and/or subsoil of the Leased Premises.  If (i) required by law, or (ii) such toxic and hazardous material or substance creates an immediate health hazard, or (iii) there is any  toxic and hazardous material or substance within 4.5 feet of grade level, , then prior to the date Landlord delivers possession of the Leased Premises to Tenant, Landlord, at Landlord's sole cost and expense, shall remove all of such toxic and hazardous materials or substances.    In addition, except for foundation piles, Tenant agrees that Tenant shall not excavate deeper than 4.5 feet from grade level, without Landlord's written consent.

12.  Exclusives

(a)  Landlord covenants and agrees that, during the continuance of this Lease, no additional property which Landlord shall, directly or indirectly, may now or hereinafter own or control and which is contiguous to the Leased Premises will be used for the operation of a drugstore or a so-called prescription pharmacy or for any other purpose requiring a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind.  In addition, no additional property which Landlord shall, directly or indirectly, may now or hereinafter own or control and which is contiguous to the Leased Premises will be used for the sale of so-called health and/or beauty aids and/or drug sundries.  Furthermore, no additional property which Landlord shall, directly or indirectly, may now or hereinafter own or control and which is contiguous to the Leased Property will be used for the operation of a business in which photofinishing film and/or photofinishing services or greeting cards are offered for sale.  This Article as it applies to the sale of so-called health and/or beauty aids shall not apply to the incidental sale of health and/or beauty aids and/or drug sundries by businesses operating in Parcel 2, provided, however, that each of said businesses shall not devote more than 10% or 150 square feet of their sales floor area, whichever is less, to the sale of so-called health and/or beauty aids and/or drug sundries. This Article as it applies to the sale of photographic film and photofinishing services shall not apply to the incidental sale of photographic film and/or photofinishing services by one camera shop operating in Parcel 2.  This Article as it applies to the sale of medicinal drugs shall not apply to doctors and/or dentists operating in Parcel 2 who provide sample doses of medicinal drugs to their patients during office visits without a fee or remuneration of any kind.

-11-

(b)  In the event no pharmacy is operated from the
Leased Premises for a period of 180 days (other than by
reasons outside of Tenant's control , including, but not
limited to, fire or other casualty, governmental
restrictions, loss of business licenses, any repairs or
remodeling [which extensions shall not exceed 365 days]),
the restrictions against other pharmacies located in
property which is contiguous to the Leased Premises as
enumerated above in paragraph (a) shall terminate.  In the
event no health and/or beauty aids and/or drug sundries are
offered for sale from the Leased Premises for a period of
180 consecutive days (other than be reasons outside of
Tenant's control  including, but not limited to, fire or
other casualty, governmental restrictions, loss of business
licenses, any repairs or remodeling[which extensions shall
not exceed 365 days]) the restrictions against another space
operating in property contiguous to the Leased Premises,
selling health and/or beauty aids and/or drug sundries as
enumerated above in paragraph (a) shall terminate.  In the
event no photofinishing services and/or photographic film or
greeting cards are offered for sale from the Leased Premises
for a period of 180 consecutive days (other than by reasons
outside of Tenant's control , including, but not limited to,
fire or other casualty, governmental restrictions, loss of
business licenses, any repairs or remodeling [which
extensions shall not exceed 365 days]), the restrictions
against another space operating in property contiguous to
the Leased Premises selling photofinishing services and/or
photographic film or greeting cards as enumerated above in
paragraph (a) shall terminate.

13.  Utilities

Tenant shall pay when due all bills any and all
utilities servicing the building on the Leased Premises,
including, but not limited to water, sewer, gas and
electricity on the date Tenant takes possession of the
Leased Premises and until expiration of term (and during any
holdover period).  The source of supply and vendor of each
such commodity shall be the local public utility company or
municipality commonly serving the area.

14.  Repairs and Maintenance

Except for Landlord's repair obligations set forth
herein and in Article 5, Tenant shall, throughout the term
of this Lease, maintain the Leased Premises in good repair,
including, without limitation, all appurtenances and all
alterations, additions and improvements to same; make all
repairs and replacements necessary to preserve the building
on the Leased Premises in good order, condition and repair,
which repairs and replacements shall be equal in quality to
the original work, and promptly pay the cost and expense of
such repairs and replacements.  Tenant shall remove as
necessary all graffiti from any building constructed on the
Leased Premises.  Notwithstanding anything in this Lease to
the contrary, in the event that any hazardous or toxic
material or substance is discovered in, under or about the
Leased Premises (unless introduced by Tenant or introduced
by anyone claiming under Tenant) and if such hazardous or
toxic material or substance creates an immediate health
hazard or if the removal of such hazardous or toxic material
or substance is required by law, then Landlord shall, at

-12-

Landlord's expense properly remove and dispose of the same.
Landlord hereby indemnifies and saves and holds Tenant
harmless from and against any liability, obligation, damage,
or cost resulting directly or indirectly from the presence,
removal or disposal of any such hazardous or toxic material
or substance.  Tenant shall, at Tenant's expense, remove any
hazardous or toxic material or substance introduced into the
Leased Premises by Tenant or by anyone claiming under
Tenant, if such hazardous or toxic material or substance
creates an immediate health hazard or if the removal of such
hazardous or toxic material or substance  is required by
law.  Tenant hereby indemnifies and saves and holds Landlord
harmless from and against any liability, obligation, damage
or cost resulting directly or indirectly from the presence,
removal or disposal of any hazardous or toxic materials or
substance introduced into the Leased Premises by Tenant or
by anyone claiming under Tenant.

### 15.  Signs, Tenant's Fixtures

Tenant may at any time, and from time to time, place or
permit to be placed signs and advertising matter, machinery
and any other mechanical equipment, on any building now or
hereafter upon the Leased Premises, including the roof of
any such building, and may remove them or permit them to be
removed, provided the same is done in full compliance with
all requirements of law pertaining thereto.  Tenant shall
have the right to install a satellite dish or other antennae
for telecommunications on any building constructed on the
Leased Premises.  Landlord hereby agrees to execute any
applications or consents required by governmental
authorities by virtue of the erection or maintenance of any
of said signs and equipment.  Tenant shall at all times have
the right to remove all fixtures, machinery, equipment and
appurtenances furnished or installed by Tenant at Tenant's
expense, it being expressly understood and agreed that said
property shall not become part of the Leased Premises but
shall at all times be and remain the personal property of
Tenant and shall not be subject to any Landlord's lien.
Tenant agrees that any installation or removal of fixtures,
machinery, equipment and appurtenances shall be done in a
good and workmanlike manner and shall comply with all
applicable laws.  Notwithstanding anything to the contrary
contained herein, Tenant shall not remove any such items
from the Leased Premises (except for Tenant's signs, trade
fixtures, satellite dishes, antennas and other personal
property) without replacing same with like replacements, but
nothing contained herein shall be construed to require
Tenant to remove and replace such items.

### 16.  Alterations

Tenant shall have the right, at all times during the
continuance of this Lease and at its own cost and expense,
to make such changes, improvements, alterations, and
additions to the Leased Premises, erect such building(s)
and/or improvements thereon, thereunder, or thereafter, as
Tenant may desire.  Any alteration performed by Tenant shall
be done in a good and workmanlike manner and shall comply
with all applicable laws.  Any new building constructed by
Tenant on the Leased Premises shall be located within the
building area as shown on attached Exhibit "B" and shall be
a one-story building.  Furthermore, the storefront of any

-13-

new building constructed by Tenant on the Leased Premises
shall be architecturally harmonious with the buildings
located on Parcel 2.  Landlord (at Tenant's expense) agrees
to reasonably cooperate with Tenant in securing such permits
as may be necessary to accomplish any of the work under the
provisions of this Lease relating to construction,
alterations, and/or building(s) to be constructed.  Tenant
shall not permit any mechanics' or other liens to stand
against the property for work or material furnished Tenant
or anyone claiming under Tenant), and shall indemnify
Landlord therefor.

17.  Fee Mortgages at Tenant's Request

(a)  Tenant and its subtenants and assignees, pursuant
to Article 23 of this Lease, shall have the sole right,
subject to the provisions of this Article, to encumber by
mortgages or deeds of trust or other proper instruments in
the nature thereof, the fee simple title of the Leased
Premises (hereinafter called "said fee").  Tenant may only
grant mortgages or deeds of trust to institutional lenders.
Tenant agrees to comply with the terms and conditions of any
mortgage or deed of trust placed by Tenant or anyone
claiming under Tenant on said fee.  From time to time, as
requested in writing by Tenant, Landlord shall and shall
cause any and all necessary parties claiming an interest in
said fee (hereinafter called "necessary parties") to join
with Tenant or its successors and assigns in the execution
and delivery of any mortgage, any deed of trust, or any
other proper instrument in the nature thereof (hereinafter
called "said mortgage") mortgaging, pledging, and
encumbering said fee to secure for Tenant or its successors
and assigns such mortgage funds.  In addition thereto,
Landlord and all necessary parties shall join in the
execution of said mortgages if so requested by the mortgagee
or Tenant.

Landlord shall cause the necessary parties to join in
the execution of note(s) or bond(s), and such related and
customary instruments as may be required to encumber said
fee or any portion or portions thereof that may be
designated by Tenant, and to execute such amendments and
modifications of this Lease and documents in connection with
said mortgages as may be reasonably required by the
mortgagee(s) at Tenant's request.  The aforesaid
instrument(s) and/or mortgage(s) shall be secured by said
fee or such part(s) thereof as shall be designated by
Tenant, and the buildings and improvements thereon.  Tenant
shall use good efforts to give Landlord thirty (30) days
notice that it will be necessary for Landlord to execute the
above mentioned documents.

(b)  Landlord and the necessary parties' obligation to
join in the execution of the aforesaid mortgage instruments
shall be subject to the following conditions:

(1)  Landlord and the necessary parties shall not
be required to execute any instrument which would obligate
Landlord or the necessary parties for the payment of any
such loan or any part thereof or for the performance or
observance of any other obligations thereunder;

-14-

(2)  Walgreen Eastern Co., Inc., as original Tenant, shall remain obligated, either directly or contingently, for the payment of the loans secured by the mortgages and for the performance and observation of all other obligations thereunder;

(3)  Tenant shall furnish Landlord with a true copy of all  mortgages and all other instruments required by lender;

(4)  The total amount of said mortgages shall not exceed $700,000.00; provided, however, that nothing shall preclude Tenant from placing a mortgage on the Leased Premises in connection with mortgages to be placed on other properties of Tenant which, in the aggregate, exceed $700,000.00 so long as the mortgage on the Leased Premises shall not serve as collateral for more than $700,000.00.

(5)  The obligation secured by all  mortgages shall be payable in full before the expiration of the term of this Lease or before any option termination date if Tenant exercises such option to terminate.  If this Lease terminates for any reason prior to the satisfaction of any mortgage, Tenant shall immediately pay off such mortgage and obtain for Landlord a release of mortgage in recordable form.

(c)  The obligation of Landlord to join in and to cause the necessary parties to join in the execution of said mortgage to mortgagee and encumber said fee shall be a covenant running with the land, as well as a personal obligation.

(d)  Nothing in this Article shall limit Tenant's rights or the rights of any leasehold mortgage.  As further security for the indebtedness secured by any mortgage created under this Article, Tenant, in the same or in separate instruments, may also grant the lender a leasehold mortgage.  In such event, the instrument or instruments creating said mortgage and leasehold mortgage may provide that, upon a default thereunder, the lender may enforce its remedies under said mortgage, the leasehold mortgage, or both, and that, if the lender exercises its remedies under both, there shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in the land by reason of the fact that the same person, firm, corporation or other entity may acquire, own or hold, directly or indirectly, Tenant's interest in this Lease and the fee estate in the land.

(e)  Landlord agrees that in the event that an institutional mortgagee under any such leasehold mortgage described in paragraph (d) above succeeds to Tenant's interest under this Lease and said Mortgagee has cured any prior Tenant defaults (if any), Landlord shall, at the time of such succession and upon request therefor by said mortgagee, execute and deliver to such successor tenant a lease containing the same covenants and conditions as are contained in this Lease for the then unexpired portion of the term hereof.

(f)  If Landlord or necessary parties, after twenty (20) days' written request from Tenant to Landlord, shall

without legal cause fail or refuse to join in the execution of the mortgage(s) and/or other instruments referred to in this Article 17, then Tenant shall have the right to resort to those remedies at law and/or equity to which it may be entitled (including specific performance and declaratory judgment) and in addition thereto:

(1) The rent due to Landlord under the terms of this Lease shall abate until Landlord and necessary parties shall have complied with their respective obligations hereunder, and during the said period any assignment by Tenant to Landlord as collateral security under this Lease or sublease(s) shall be ineffective and there shall be no rent, impositions, or other payments due or payable hereunder; and

(2) Landlord shall reimburse Tenant, pro rata, for the amount of impositions paid, rent paid and the amount of payments made by Tenant pursuant to Article 5(b) attributable for the period during which Landlord or necessary parties shall have failed or refused to comply with its obligations hereunder.

(3) If Tenant shall fail or refuse to pay any type(s) of rent, impositions, taxes, assessments, or other payment under this Lease during said period that Landlord or necessary parties shall refuse or fail to join in the execution of the mortgage and other instruments, such failure or refusal on Tenant's part shall only be deemed a default under this Lease if it is determined that Landlord's refusal to execute the mortgage and/or other instruments was with legal cause and justification.

(4) If Landlord, after twenty (20) days written notice from Tenant to Landlord, shall without legal cause fail to refuse to join in the execution of said mortgage and/or any other instruments referred to in this Article, Landlord does hereby appoint Tenant as its true and lawful attorney in fact for the purpose of executing in its place and on its behalf said mortgage documents and any other instruments referred to in this Article. This power is irrevocable and coupled with an interest and will remain in full force and effect during the full term of this Lease. Landlord shall cause the necessary parties to appoint Tenant its true and lawful attorney in fact for the purpose of executing said mortgage documents in the event said necessary parties shall fail or refuse to execute said mortgage documents.

(g) Subject to Section (J) of this Article, on the written request of the holder of the mortgage(s) under this Article 17, Landlord shall assign its interest in this Lease and all subleases of the Leased Premises or portion(s) thereof as collateral security in connection with the mortgage loan(s). Upon the written request of the holder of the mortgage(s) under this Article 17, Landlord shall use best efforts to cause the necessary parties to assign their respective interests in said fee as collateral security in connection with the mortgage loan(s).

(h) Tenant shall have the right at any time and from time to time, during the existence of this Lease, to replace or refinance the permanent mortgage(s) and obtain such

-16-

permanent loan(s) as Tenant may deem practical, provided such mortgage(s) comply with the requirements of this Article.

(i)   In conjunction with the replacement and/or refinancing set forth herein, Landlord shall comply and Landlord shall cause the necessary parties to comply with all other terms and provisions of this Article 17 as if such replacement and/or refinancing were the first permanent financing hereunder.

(j)   Nothing contained in this Article shall obligate Landlord to execute any document which creates an assignment of Landlord's right to receive the rents required to be paid under this Lease or obligates Landlord to make any mortgage payment.

(k)   Provided Landlord's mortgage referenced in Article 30(d) of this Lease is released of record and subject to the terms and conditions hereof, Landlord shall have the right to place a first mortgage on the Leased Premises provided that Landlord and Landlord's mortgagee agree to the following conditions and that the applicable mortgage documents contain all of the following terms:

(1)   Any such mortgage shall be subject to the terms of said Easement Agreement, as said Easement Agreement may be modified or extended.

(2)   Any such mortgage shall be subject to this Lease and all subsequent amendments (made with Landlord's mortgagee's consent).

(3)   Landlord's Lender shall at any time and from time to time, upon demand from Tenant, execute, acknowledge and deliver a subordination agreement in the form attached hereto and made a part hereof as Exhibit "D."

(4)   Any such mortgage granted by Landlord shall be subject and subordinate in all respects to (i) any present mortgage (or deed of trust) granted by Tenant, (ii) any future mortgage (or deed of trust) granted by Tenant, and (iii) any extension, renewal, consolidation of any present or future mortgage granted by Tenant.  Such subordination shall be automatic and without need for further documentation.  Landlord and Landlord's lender further agree that Landlord and Landlord's lender will, at any time and from time to time, upon demand, execute, acknowledge and deliver a subordination agreement in the form of attached hereto and made a part hereof as Exhibit "E."

18.  Damage and Fire

(a)   In case of damage to or destruction of the building located on the Leased Premises and said other improvements as a result of fire or other insured casualty, Tenant may, at its option, repair or restore the same , replace same with other buildings or improvements (which shall comply with Article 16), or do neither of the foregoing.  In the event that Tenant elects not to rebuild or restore the improvements, Tenant shall grade over the Leased Premises.  The proceeds of any insurance maintained

by Tenant shall first be used to pay off any existing first
mortgage obtained by Tenant and the remainder shall be
payable to Tenant.  If Tenant elects not to insure the
building located on the Leased Premises, then Landlord, at
Landlord's sole cost and expense, shall have the right to
obtain a fire insurance policy on the building located on
the Leased Premises and Landlord shall be entitled to all
proceeds of such fire insurance maintained by Landlord.

(b)  Landlord acknowledges that it has no interests in
or claims against the proceeds of insurance policies
maintained by Tenant under this Article.  Tenant
acknowledges that it has no interest or claims against the
proceeds of any fire insurance policy that Landlord may
maintain under this Article.

(c)  If the damage or destruction referred to in
Section (a) occurs during the last two years of the entire
term of this Lease or during the last two years prior to any
of Tenant's options to terminate, then and in such event,
Tenant shall have the right and option, to terminate this
Lease effective as of the date of such happening by sending
notice to Landlord within sixty (60) days of the date of
such damage or destruction; and any other rents paid in
advance shall be refunded to Tenant.

(d)  There shall be no abatement of rent as a result of
damage or destruction of the building located on the Leased
Premises as a result of fire or other casualty.

19.  Default

(a)  If the Tenant shall default in the payment of rent
on the date provided for in this Lease, and if such default
shall continue for a period of ten (10) days after receipt
by Tenant of written notice of said non-payment; or (except
as other provided in this Lease), in the event that Tenant
shall default or fail in the performance of a covenant or
agreement on its part to be performed in this Lease, and
such default shall not have been cured for a period of
thirty (30) days after receipt by Tenant of written notice
of said default from Landlord, or if such default cannot,
with due diligence, be cured within thirty (30) days, and
Tenant shall not have commenced the remedying thereof within
such period or shall not be proceeding with due diligence to
remedy it (it being intended in connection with a default
not susceptible of being cured by Tenant with due diligence
within thirty (30) days that the time within which to remedy
same shall be extended for such period as may be necessary
to complete same with due diligence), then, and in such
case, Landlord may, at Landlord's option, subject to Article
17 herein, terminate this Lease and enter upon said Leased
Premises or any part thereof and expel the said Tenant, or
any person or persons occupying said premises and to
repossess and enjoy the said premises, subject to the rights
of any subtenants having non-disturbance agreement(s).  In
addition, if for a failure to pay rent for a period of ten
(10) days after receipt of notice, Landlord shall have the
right, subject to Article 17 herein, to enter the Leased
Premises without terminating this Lease.  If Landlord should
re-enter the Leased Premises with or without terminating
this Lease, as provided for above, Landlord must use
reasonable efforts to relet the Leased Premises for fair

market value in mitigation of Landlord's damages. Notwithstanding Landlord's right to re-enter the Leased Premises with or without terminating this Lease, as provided for above, this Lease and Tenant's liability shall terminate upon the next option termination date as provided for in Article 2(d) hereof.

No notice under this Lease by Landlord shall be deemed to have been given to Tenant unless simultaneously therewith a copy of such notice is sent by registered or certified mail, return receipt requested, to said holders of mortgage(s), at such addresses as Landlord may, from time to time, be advised.

(b) Any one or more of the persons, parties, or entities described in Article 17 shall have the right to cure Tenant's default hereunder, and the same shall constitute a curing of default(s) hereunder with like effect as if the Tenant had cured same.

(c) If Landlord shall from time to time fail to pay any sum or sums due Tenant, and if such failure continues for ten (10) days after receipt of notice from Tenant, Tenant shall gave the right and is hereby irrevocably authorized and directed to deduct such sum or sums from the rent and other charges payable to Landlord. If Landlord shall from time to time fail to perform any act or acts required of Landlord by this Lease (act by Landlord shall be deemed to include instances wherein Landlord is required to cause said necessary parties to act), and then, unless Landlord commences within thirty (30) days after receipt of notice from Tenant to perform same (or such different period as specified under this Lease) and diligently proceeds therewith, Tenant shall then have the right, at Tenant's option, to perform such act or acts and the full amount of the cost and expenses so incurred in excess of any portion thereof which Tenant would have had to pay to Landlord had Landlord performed the obligation in question, shall immediately be owing by Landlord to Tenant, and Tenant shall have the right and is hereby irrevocably authorized and directed to deduct such amount from the rent and other charges payable to Landlord.

20. Condemnation

(a) Landlord hereby assigns to Tenant and Landlord shall cause the necessary parties to assign to Tenant (i) any award to which it or they may become entitled by reason of any taking, by condemnation or other proceeding, or the temporary requisition, of all or a portion of the Leased Premises or all or a portion of the building located thereon by any governmental authority. Tenant is hereby authorized to appear on behalf of Landlord and the necessary parties in all such proceedings, to conduct negotiations and to enter into final settlements with the condemning authorities and insurers, and Tenant agrees to take or cause to be taken such action in all such proceedings as shall be appropriate to protect the interests of Landlord, necessary parties, and Tenant in the Leased Premises and in such proceedings. So long as a mortgage is in effect, any award made on account of any such taking (which is payable to Tenant under this Article), and any proceeds paid on any insurance coverage maintained by Tenant as a result of any such casualty, may be paid to the mortgagee (as defined in Article 17) and

-19-

applied pursuant to said mortgage to satisfy the full amount of the mortgage indebtedness then outstanding.  The remainder of such award (if any) shall be applied in accordance with the provisions of Section (b) of this Article.  Landlord shall have the right to appear on behalf of Landlord to pursue any award allocated Landlord under this Lease.

(b)  Such award or proceeds, less any expenses incurred in collecting any such award or proceeds, shall be divided between Landlord and Tenant as follows:  The amount allocable to the land (exclusive of any amount allocable to the buildings, structures, and other improvements) shall be payable to Landlord (or necessary parties as so directed in writing by Landlord and necessary parties) and the balance of the award shall be payable to Tenant.  Upon any such taking pursuant to this Article, the rent payable pursuant to Article 3 shall be reduced by multiplying such rent by a fraction, the numerator of which fraction shall be the number of square feet of the Building on the Leased Premises taken in such taking and the denominator of which shall be the number of square feet of the Building within the Leased Premises prior to such taking.

(c)  In the event of a partial taking as above described, Tenant, at its sole option, reasonably exercised, may terminate this Lease, upon notice to the Landlord, effective as of the date specified in such notice or Tenant, at its option, may elect to continue this Lease and reconstruct the improvements on the Leased Premises remaining after the taking in such manner and to such extent as Tenant deems suitable.

(d)  In the event any of the parking areas or other common areas of Parcel 2 shall be taken by reason of condemnation or under eminent domain and if, in the opinion of Tenant, reasonably exercised, the Leased Premises is no longer suitable for Tenant's business, this Lease, at Tenant's option, by notice to Landlord within sixty (60) days of such taking shall terminate.  If this Lease is not terminated, Landlord, at Landlord's expense, shall restore the remaining common areas and parking areas to a proper and usable condition.  In the event of any such taking of the parking areas or other common areas of Parcel 2, both parties may pursue their own separate awards in connection with such condemnation.

21.  Non-Disturbance of Subtenants by Landlord

(a)  Landlord agrees that in the event of the termination of this Lease because of any breach or default by Tenant, Landlord will not terminate any sublease(s) which shall still be in full force and effect, disturb the possession or leasehold rights of subtenants, or claim that such breach or default by Tenant is attributable to or affords remedy against such sublessee, provided that (i) the rent(s) and other charges payable by such subtenant(s) shall not be less than the rent and other charges payable by Tenant under this Lease, and (ii) such sublessee(s) have the same obligations as Tenant does under this Lease, and (iii) such sublessee has a net worth of not less than $5,000,000.00.

-20-

(b)  Landlord shall execute a reasonable non-disturbance agreement in favor of subtenants who meet the criteria of section (a) above, at the time of execution of any sublease of the Leased Premises, the improvements of any portion thereof.  Such non-disturbance agreements shall be executed in recordable form within twenty (20) days after written request by Tenant therefor.

## 22.  Estoppel Certificates

(a)  Each party shall, without charge, at any time and from time to time, within ten (10) days after written request by the other, certify by written instrument, which Landlord or Tenant respectively shall duly execute and acknowledge in recordable form, and deliver to the other, any mortgagee selected by the requesting party, any assignee of any mortgagee or purchaser, any proposed mortgagee, proposed purchaser, or any other person, firm or corporation specified by the requesting party:

(i)  That this Lease is unmodified and in full force and effect (or, if there has been a modification, that the same is in full force and effect as modified and stating the modification);

(ii) The dates, if any, to which the rent, impositions, and other charge hereunder have been paid in advance;

(iii)  Whether Tenant or Landlord, as the case may be, is or is not in default in the performance of any covenant, condition or agreement on such party's part to be performed and the nature of the default, if any; and such other pertinent information as Tenant or Landlord or the holder of a mortgage described in Article 17 hereof may reasonably request.

## 23.  Assignment and Subletting

(a)  Tenant may sublet the Leased Premises or any part thereof, and may assign, transfer, sell, mortgage or pledge its interest under this Lease together with or separately from the improvements constructed by Tenant and its interest in and to any sublease or the rentals payable thereunder. Subject to Article 23 (b), Tenant shall not sublet the Leased Premises or assign this Lease to a use which is in violation of any exclusive granted by Landlord to any tenant in Parcel 2 which is in full force and effect at the time of the proposed sublet or assignment.  In addition, if fifty (50%) percent or more of the ground floor area of the buildings in Parcel 2 are being used for retail purposes, then Tenant may only sublet the Leased Premises or assign this Lease for retail purposes.  If less than fifty (50%) percent of the ground floor area of the buildings in  Parcel 2 are being used for a retail use, then Tenant may sublet the Leased Premises or assign this Lease for any lawful purpose; provided, however, such non-retail sublessee(s) or assignee shall only be entitled to use thirty-five (35) parking spaces on the Leased Premises and  Parcel 2 (in the aggregate).  This parking restriction shall be enforced by the use of stickers to be placed upon the vehicles of such sublessees or assignee and their employees.  No mortgage, pledge or assignment of this Lease as security shall impair

-21-

or diminish any obligations of Tenant hereunder or impose any obligations under this Lease on the mortgagee, pledgee, or assignee thereof. Any interest so assigned may be assigned and reassigned in like manner by any assignee thereof. Although no assignment or sublease hereunder shall require the consent of Landlord, if such consent is requested, it shall not be unreasonably withheld or delayed. Any assignment or sublease of this Lease shall not relieve Tenant of primary liability under this Lease, provided, however, that Tenant shall not be liable under the provisions of any modification to this Lease made by Landlord and any assignee or subtenant. No assignment or sublease shall be to an entity which intends to use the Leased Premises for any activity which would violate any ordinance, law or regulation.

(b)   Notwithstanding anything to the contrary, contained in Article 23 (a), in the event Tenant's sublease [entire] of the Leased Premises or assignment of this Lease is a part of a simultaneous or near simultaneous transfer of at least ten locations in the Commonwealth of Massachusetts to the same entity, then such a sublet of the Leased Premises or assignment of this Lease shall not be subject to any exclusive granted by Landlord to any Tenant in Parcel 2.

(c)   (i)   At any time and from time to time, Tenant may discontinue the operation of its store on the Leased Premises.

(ii)   If during the first one hundred eighty (180) full calendar months following Tenant's Opening Date, no business shall be conducted on the Leased Premises for a continuous period in excess of 365 days (except by reasons of strikes, fires, casualty, repairs or remodeling, except by reason of assignment or subletting, except by reason of governmental restrictions, except by reason of the loss of any of Tenant's business licenses, or except by any other reason beyond the reasonable control of Tenant which extensions shall not exceed three hundred sixty-five [365] days), Landlord shall have the right and option to terminate this Lease upon notice to Tenant, effective on the last day of the next succeeding calendar month following Tenant's receipt of such notice; provided that (i) Tenant is not currently negotiating a proposed sublease or assignment of lease; (ii) if there is a mortgage on the Leased Premises, the mortgage permits the early termination of this Lease; (iii) if there is a mortgage on the Leased Premises, the mortgage does not levy a penalty on Tenant for the early payment of the note secured by the mortgage and (iv) Landlord pays to Tenant the unamortized book value of the building and all other improvements on the Leased Premises, as such building and improvements are shown on Tenant's books.

(iii)   If after the first one hundred eighty (180) full calendar months following Tenant's Opening Date, no business shall be conducted on the Leased Premises for a continuous period in excess of 365 days (except by reasons of strikes, fires, casualty, repairs or remodeling, except by reason of assignment or subletting, except by reason of governmental restrictions, except by reason of the loss of any of Tenant's business licenses, or except by any other reason beyond the reasonable control of Tenant which

extensions shall not exceed three hundred sixty-five [365] days), Landlord shall have the right and option to terminate this Lease upon notice to Tenant, effective on the last day of the next succeeding calendar month following Tenant's receipt of such notice provided that Landlord pays to Tenant the unamoritzed book value of the building and all other improvements on the Leased Premises as such building and improvements are shown on Tenant's books.

(iv)  If no business is being conducted in the Leased Premises for a continuous period of three hundred sixty-five (365) days, Tenant shall, upon receipt of written request by Landlord, provide to Landlord, Tenant's unamortized book value of the building and all other improvements on the Leased Premises.

24.  <u>Sale - Leaseback</u>

(a)  Tenant shall have the right any time during the term of this Lease to sell, assign, sublease, transfer or convey its interest under this Lease, and in and to the improvements on the Leased Premises and simultaneously therewith retain or receive an interest by way of a sublease or similar possessory arrangement, sometimes known as "leaseback."  Landlord shall, and Landlord shall cause necessary parties to effectuate such transaction, including but not limited (i) such instruments in the nature of a subordination of this Lease to a mortgage or Deed of Trust or similar instrument (and consents to and assignments thereof) mortgaging, pledging or encumbering said fee in connection with said sale/leaseback transaction, as may be required, (ii) such instruments in the nature of a mortgage or deed of trust or similar instrument, mortgaging, pledging or encumbering said fee in connection with said sale/leaseback transaction as may be required, and (iii) such instruments in the nature of a subordination of any present or future mortgage, deed of trust or other encumbrance on said fee other than those placed or suffered by or at the direction of Tenant or its assigns. Notwithstanding anything to the contrary contained herein, Landlord and/or such necessary parties shall not be required to execute any such instruments unless the transaction in question shall comply with the provisions of Sections (a), (b), and (c), and (j) of Article 17 of this Lease.
(b)  In the event Landlord and/or necessary parties fail or refuse to execute any of such documentation, Tenant's remedies for such failure shall be those remedies provided Tenant in Article 19 herein.

(c)  In the event of a "leaseback" transaction as described in Section (a) of this Article 24, Tenant shall remain liable and have all benefits under this Lease subject to the rights of subletting and assignment as set forth in this Lease.

25.  <u>Landlord's Conveyance</u>

Nothing in this Lease shall prohibit Landlord from selling, assigning or conveying its interest under this Lease and its interest in the Leased Premises.

26.  <u>Merger</u>

There shall be no merger of this Lease or of the leasehold estate hereby created into any other estate or

-23-

interest in the Leased Premises or any portion thereof as a
result of the holding by said person or entity, directly or
indirectly of, (a) this Lease or the leasehold estate hereby
created or any interest in this Lease or such leasehold
estate, and (b) any such other estate or interest in the
Leased Premises or any portion thereof. This lease shall
not be terminated for any cause except as expressly provided
herein.

27.  Notices

All notices, instruments and communications permitted
or required to be delivered pursuant to this Lease shall be
in writing and shall be sent by United States mails, postage
prepaid, registered or certified, return receipt requested,
addressed as follows:  To Landlord:  at the address
specified in the Article for the payments of rents and to
Tenant: at 200 Wilmot Road, Deerfield, Illinois 60015,
Attention:  Law Department provided, each party by like
notice may designate any future or different or additional
(not to exceed one (1) additional copy of the notice)
addresses to which subsequent notices shall be sent.  So
long as Landlord shall have been given notice of the name
and address of the mortgagee in the manner provided for
notices in this Article or shall have joined in the
mortgage, a duplicate copy of any notice, instrument, or
communication given to Tenant shall be given at the same
time to such mortgagee, and such notice, instrument, or
communication shall not be deemed to have been properly
given or sent unless so sent to such mortgagee.  Notices
shall be deemed given upon receipt or refusal to accept
delivery.

28.  Tax Treatment

Tenant or its assigns shall have the benefit of all
depreciation, depletion, amortization, deductions or
allowances related to the improvements on the Leased
Premises, under the Internal Revenue Code of 1954 as amended
and under any income or similar tax statute enacted by the
Commonwealth of Massachusetts.

29.  Surrender

At the expiration or termination of this Lease, Tenant
shall surrender immediate possession of the Leased Premises.
Any buildings or improvements on the Leased Premises as of
the expiration or termination date of this Lease shall be
deemed relinquished by Tenant to Landlord, in such condition
as the same may be, Tenant having no obligation to deliver
any such improvements and/or building nor having any
obligation with respect to the condition thereof.  Any
holding over by Tenant shall not operate, except by written
agreement, to extend or renew this Lease or to imply or
create a new lease, but in such case Landlord's rights shall
be limited to either the immediate termination of Tenant's
occupancy or the treatment of Tenant's occupancy as a
month-to-month tenancy, any custom or law to the contrary
notwithstanding.

30.  Title and Possession

(a)  Landlord covenants, represents, and warrants that
Landlord has fee simple title to the  Leased Premises and

Parcel 2 and the right to make this Lease, that said Leased Premises are free and clear of all liens, encumbrances and mortgages except as shown on Exhibit "C" attached hereto and made a part hereof and shall remain free of all encumbrances for the duration of this Lease except for such encumbrances, which Tenant, at Tenant's sole discretion, approves.

(b)  Landlord covenants and warrants that Landlord and the necessary parties will not, during the term hereof, in any manner, mortgage or otherwise encumber the fee title to the Leased Premises except as so required and as permitted under Article 17 and Article 24 of this Lease.

(c)  In the event said property is not free and clear of all liens, encumbrances and restrictions, as set forth in Section (a) above, Landlord shall remove such liens, encumbrances and restrictions to the satisfaction of Tenant and any of Tenant's mortgagees upon request to do so.  Upon paying the rents and keeping the agreement of this Lease on its part to be kept and performed, Tenant and subtenants, purchasers and assignees of Tenant shall have peaceful and uninterrupted possession during the continuance of this Lease.  Landlord shall furnish Tenant satisfactory evidence of Landlord's title to the Leased Premises and Parcel 2. Tenant shall, at Tenant's expense prior to the lease commencement date obtain a commitment for an ALTA policy of title insurance, issued by a title insurance company acceptable to Tenant, binding said insurance company to insure Landlord's fee ownership, Tenant's leasehold estate (in an amount not less than $700,000.00) in the Leased Premises, subject only to this Lease those matters set forth in Exhibit "C," and such other covenants, restrictions and encumbrances as Tenant may approve.  Such commitment shall be brought current through the date of recordation of a Memorandum of Lease.  Such title insurance policy shall be effective as of the date or recordation hereof.  Tenant's obligations under this Lease or to Landlord are expressly contingent upon, in addition to other conditions precedent contained in this Lease, Landlord's ownership of fee simple title to the Leased Premises, subject to only those exceptions, restrictions, limitations, covenants, liens or encumbrances which Tenant may accept and those items set forth on Exhibit "C."  In the event that Tenant is unable to obtain aforedescribed policy of title insurance, subject only to those objections on title acceptable to Tenant and those listed on Exhibit "C," Tenant may, as its sole remedy, terminate this Lease and neither party shall have any other or further liability to the other if occurring prior to delivery of such possession.

(d)  Tenant acknowledges that a Mortgage and Security Agreement dated October 30, 1984, and Assignment of Leases and Rents and a UCC Financing  statement has been granted to Woonsocket Institution for Savings (now known as Eastland Savings Bank), which Mortgage and Security Agreement is registered in the Essex County Southern Registry District of the Land Court as Document No. 198116 and recorded in the Essex County Southern District Registry of Deeds in Book 7568 at page 408, (as the same has been modified) remains a lien against the Leased Premises.  Prior to the Lease Commencement Date, Landlord shall provide to Tenant a Subordination Agreement in the form attached hereto and made a part hereof as Exhibit "D."

-25-

(e) If said Easement Agreement is subject to any mortgage, Deed of Trust other encumbrance in the nature of a mortgage, it is the further expressed condition hereof that Landlord shall thereupon furnish and deliver to Tenant, in form and substance acceptable to Tenant, an agreement executed by such mortgagee or trustee, making such mortgage, Deed of Trust or other encumbrance in the nature of a mortgage subject and subordinate to said Easement Agreement and all of Tenant's rights thereunder.

31. Brokers

The parties mutually represent to each other that it has dealt with no broker or agent with respect to this transaction. In no event shall Tenant be or become obligated or liable for any broker's or agent's fee or commission in connection with this Lease, and Landlord and Tenant hereby indemnify and save and hold the other party harmless from any such claim, action, damage, cost, fee or expense arising from any claim by any such broker or agent.

32. Indemnity

Each party hereby agrees to indemnify and save and hold the other harmless from all loss, cost and expense resulting from the negligent acts or omissions of the other (or those claiming under such party) or their respective employees and agents.

33. Miscellaneous

Captions of the several articles contained in this Lease are for convenience only and do not constitute a part of this Lease and do not limit, affect, or construe the contents of such articles.

34. Law

This instrument shall merge all undertakings between the parties hereto with respect to the Leased Premises and shall constitute the entire lease contract unless otherwise hereafter modified by both parties in writing.

35. Successors

This instrument shall also bind and benefit, as the case may require, the heirs, legal representatives, assigns and successors of the respective parties, and all covenants, conditions and agreements herein contained shall be construed as running with the land.

36. Landlord's Exculpation

In the event of any transfer, assignment or conveyance of Landlord's interest in the lease, Landlord shall be relieved of all covenants and obligations of Landlord hereunder provided that such purchaser or successor has assumed all such covenants and obligations of the Landlord hereunder.

Tenant acknowledges and agrees that the liability of Landlord under this Lease shall be limited to Landlord's interest in the Leased Premises and the rents, income and profits thereunder which become payable subsequent to the

notice of such Landlord default in question.  Nothing contained herein, shall limit Tenant's right to injunctive or other equitable relief.

37.  Mutual Waiver of Subrogation

Landlord and Tenant agree that, in the event of loss due to any of the perils for which they have provided insurance, each party shall look solely to its insurance for recovery.  Landlord and Tenant hereby grant to each other, on behalf of any insurer providing insurance to either of them, with respect to the Leased Premises, a waiver of any right of subrogation which any insurer of one party may acquire against the other by virtue of payment of any loss under such insurance, provided that such waiver of the right of subrogation shall not be operative where the effect is to invalidate such insurance coverage.

38.  Use

(a)  Subject to Article 23 of this Lease and so long as Tenant (or any  subsidiary  affiliate or parent corporation of Tenant) shall operate in the Leased Premises, Tenant shall operate a store similar in nature to a majority of its other stores in the Commonwealth of Massachusetts, with the right to sell such merchandise and provide such services, as Tenant may, from time to time, sell and provide in a majority of its other stores in the Commonwealth of Massachusetts.  Nothing contained herein shall be construed so as to prohibit Tenant from expanding or eliminating any department(s) or from expanding or eliminating any line(s) of merchandise in the Leased Premises.

(b)  The Leased Premises shall not be used for purposes of a cocktail lounge, bar, disco, bowling alley, pool hall, billiard parlor, skating rink, roller rink, amusement arcade, adult book store, adult theater, adult amusement facility, or facility selling or displaying pornographic materials or having such displays, second hand store, auction house or any use which creates a nuisance.

39.  Other Conditions

Landlord shall not permit or suffer any other occupant of Parcel 2 to use any premises or any portion thereof for purposes of a cocktail lounge, bar, disco, bowling alley, pool hall, billiard parlor, skating rink, roller rink, amusement arcade, adult book store, adult theater, adult amusement facility, or any facility selling or displaying pornographic materials or having such displays, second hand store, auction house, office or any use which creates a nuisance.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease, under seal, as of the day and year first above written.

WALGREEN EASTERN CO., INC.

By _____
          Vice President

Attest:

_____
       Assistant Secretary

Witnesses:

_____

_____

MAOLIS REALTY TRUST

By _____
Gordon Hall III, Trustee as
aforesaid and not individually

By _____
John Ryder, Trustee as
aforesaid and not individually

Witnesses:

_____

_____

-28-

EXHIBIT A

That certain parcel of land located in Lynn, Essex County, Massachusetts, more particularly described as follows:

Beginning at a point on Joyce Street, said point being two hundred twenty five and fifty hundredths (225.50) feet distant from the northwesterly corner of Joyce and Union Streets, thence running S42-20-15W for a distance of one hundred eighty seven and thirty three hundredths (187.33) feet. Thence running N47-47-48W for a distance of eighty nine (89.00) feet. Thence running N42-20-15E for a distance of one hundred eighty seven and twenty seven hundredths (187.27) feet to Joyce Street. Thence running S47-50-00E along the sideline of Joyce Street for a distance of eighty nine (89.00) feet to the point of beginning.

Said parcel, containing 16,670± S.F., is shown as parcel # 2 on a plan entitled "SUBDIVISION OF LAND IN LYNN, MA OWNED BY MAOLIS REALTY TRUST SCALE 1" = 20' DATED OCT. 3, 1991" BY LANDMARK ENGINEERING & SURVEYING, INC. and filed at the Southern Essex Registry of Deeds in Plan Book 271 Plan 91.

## EXHIBIT C

1.  Real estate taxes not yet due and payable.

2.  Leases of premises within Lot 2, none of which impair any of the rights granted herein to Tenant.

3.  Mortgage and Security Agreement dated October 30, 1984, and Assignment of Leases and Rents and UCC Financing Statement, granted to Woonsocket Institution For Savings (now known as Eastland Savings Bank), which Mortgage and Security Agreement is registered in the Essex County Southern Registry District of the Land Court as Document No. 198116 and recorded in the Essex County Southern District Registry of Deeds in Book 7568 at Page 406, as the same have been amended.

4.  Easement from Frank Properties, Inc., to Massachusetts Electric Company, dated August 2, 1966, recorded with said Registry of Deeds in Book 5387, Page 797, together with Plan 393, of 1966.  This easement is located upon Lot 2 and not the Leased Premises.

5.  Easement granted by Frank Properties, Inc., to Massachusetts Electric Company dated August 2, 1966, and recorded with said Registry of Deeds in Book 5387, Page 799.  This easement is located upon Lot 2 and not the Leased Premises.

LYNNMA/240

EXHIBIT "D"

SUBORDINATION AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT made in multiple copies as of the _____ day of _____, 1992, by and between EASTLAND SAVINGS BANK, a Rhode Island banking corporation ("Mortgagee") and WALGREEN EASTERN CO., INC., a New York corporation ("Tenant");

W I T N E S S E T H :

WHEREAS, by Ground Lease dated _____ ("said Lease"), GORDON HALL III AND JOHN RYDER, as Trustees of MAOLIS REALTY TRUST, under Declaration of Trust dated September 24, 1979, and registered with the Essex County, Southern District of the Land Court, as Document No. 172007, as landlord ("Landlord"), leased to Tenant, as tenant, the property legally described on attached Exhibit "A";

WHEREAS, Mortgagee is the holder of a certain Note in the principal amount of $_____, secured by a Mortgage dated _____ by Landlord, recorded on _____, as Document No. _____, in the Official Records of _____ County, Massachusetts ("said Mortgage"), covering the property legally described on attached Exhibit "A" ("Leased Premises");

WHEREAS, Mortgagee and Tenant desire to confirm their understanding with respect to said Lease and said Mortgage;

NOW, THEREFORE, in consideration of the Premises and the mutual covenants and promises contained herein and other good and valuable consideration, the parties agree as follows:

1.   Said Mortgage is hereby subordinate and inferior to said Lease and to the leasehold estate created by said Lease and to all of Tenant's rights thereunder.

2.   Tenant agrees to use good faith efforts to send to Mortgagee a copy of all Landlord default notices sent to Landlord pursuant to said Lease.  Mortgagee shall have the right to cure such Landlord defaults during the same time period granted Landlord under said Lease.

3.   This Agreement shall also bind and benefit the heirs, legal representatives, successors and assigns of the respective parties hereto, and all covenants, conditions and agreements herein contained shall be construed as running with the land.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement, under seal, as of the day and year first above written.

WALGREEN EASTERN CO., INC.    EASTLAND SAVINGS BANK

By_____    By_____
        Vice President                    Vice President

Attest:                        Attest:

_____    _____
    Assistant Secretary                Secretary

Witnesses:                     Witnesses:

_____    _____

_____    _____


STATE OF NEW YORK    )
                     )SS
COUNTY OF _____  )

    On this ___ day of _____, 19___, before me appeared _____ and
_____, to me personally known, who, being by me duly sworn, did say that they are the Vice President and Assistant Secretary of WALGREEN EASTERN CO., INC., and that the seal affixed to said instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of its board of directors and said Vice President and Assistant Secretary acknowledged said instrument to be the free act and deed of said corporation.


                        _____
                        (Signature)


                        _____
                        (Title)

            My commission expires:_____)

COMMONWEALTH OF MASSACHUSETTS )
                             )SS
COUNTY OF _____ )

    On this ___ day of _____, 19___, before me appeared _____ and
_____, to me personally known, who, being by me duly sworn, did say that they are the Vice President and Secretary of EASTLAND SAVINGS BANK, and that the seal affixed to said instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of its board of directors and said Vice President and Secretary acknowledged said instrument to be the free act and deed of said corporation.


                        _____
                        (Signature)


                        _____
                        (Title)

        My commission expires:_____)

EXHIBIT "E"

SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT made in multiple copies as of the _____ day of _____, 1992, by and between _____ ("Landlord's Mortgagee") and _____ (Tenant's Mortgagee);

W I T N E S S E T H :

WHEREAS, by Lease dated _____, ("said Lease"), GORDON HALL III AND JOHN RYDER, as Trustees of MAOLIS REALTY TRUST, under Declaration of Trust dated September 24, 1979, and registered with the Essex County, Southern District of the Land Court, as Document No. 172007, as landlord, leased to Tenant, as tenant, certain premises described and as legally described on Exhibit "A" attached hereto and made a part hereof;

WHEREAS, Tenant's Mortgagee is the holder of a certain Note in the principal amount of $_____, secured by a Mortgage dated _____ ("Tenant's Mortgage") by Walgreen Eastern Co., Inc., a New York corporation, recorded on _____, in the Official Records of _____ County, Massachusetts, covering the property legally described on attached Exhibit "A";

WHEREAS, Landlord's Mortgagee is the holder of a certain Note in the principal amount of $_____, secured by a Mortgage dated _____, ("Landlord's Mortgage"), by Landlord, recorded on _____, as Document No. _____, in the Official Records of _____ County, Massachusetts covering the property legally described on attached Exhibit "A" ("Leased Premises");

WHEREAS, Landlord's Mortgagee and Tenant's Mortgagee desire to confirm their understanding with respect to Landlord's Mortgage and Tenant's Mortgage;

NOW, THEREFORE, in consideration of the Premises and the mutual covenants and promises contained herein and other good and valuable consideration, the parties agree as follows:

1.  The lien of said Landlord's Mortgage is hereby subordinate and inferior to the lien of said Tenant's Mortgage, including all modifications, consolidations, renewals and replacements of said Tenant's Mortgage and to all of Tenant's Mortgagee's rights thereunder.

2.  In the event of a default under Tenant's Mortgage, Landlord's Mortgagee will receive the same default notices provided to Tenant and will have the right, but not the obligation, to cure such default(s) within the same period granted to Tenant, provided, however, if Tenant is properly contesting such alleged default, Landlord's Mortgagee will not cure such default unless Landlord's Mortgagee reasonably believes it is necessary to avoid a foreclosure or a loss of the collateral.

(This instrument prepared by Anthony C. Sgarlata, 200 Wilmot Road, Deerfield, Illinois 60015)

3.  This Subordination Agreement is subject to the limitation that the amount of Tenant's Mortgage on the Leased Premises shall not exceed $700,000.00.

4.  Notwithstanding anything contrary herein, this Subordination Agreement shall not alter Landlord's Mortgagee's right to collect rent under said Lease pursuant to an Assignment of Lease and Rents dated _____, unless and until Tenant's Mortgagee has completed its foreclosure of the Leased Premises.

5.  This instrument shall also bind and benefit, as the case may require, the heirs, legal representatives, assigns and successors of the respective parties, and all covenants, conditions and agreements herein contained shall be construed as covenants running with the land.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement, under seal, as of the day and year first above written.

_____        _____

By_____        By_____
       Tenant's Mortgagee                Landlord's Mortgagee

Attest:                              Attest:


_____        _____
  Assistant Secretary

Witnesses:                           Witnesses:


_____        _____


_____        _____

(NOTARY)

## GUARANTY

In consideration of the sum of One Dollar ($1.00) to the undersigned, WALGREEN CO. an Illinois corporation, in hand paid, receipt where is hereby acknowledged, and in further consideration of the granting at the request of the undersigned of the attached and foregoing Lease, dated _July 27, 1992_ , between Gordon Hall III and John Ryder, as Trustees of Maolis Realty Trust dated September 24, 1979 and registered with the Essex County, Southern District of Land Court as Document No. 172007 , as Landlord, and WALGREEN EASTERN CO., INC., as Tenant, covering the premises therein described and  in Lynn, Commonwealth of Massachusetts, the undersigned hereby guarantees the full and faithful performance of and compliance with all the terms, covenants and conditions upon the part of WALGREEN EASTERN CO., INC., as Tenant, and its assigns in said Lease contained.

The undersigned shall not have any liability hereunder to Landlord or any other party with respect to any (i) occurrence during any renewal or extension period nor for the renewal or extension itself, or (ii) increase in Tenant's obligations under the Lease affected by any modification or amendment of the Lease, unless the renewal, extension, or modification, as the case may be, is consented to in writing by the undersigned.

Simultaneously with any default notice sent to Tenant, Landlord shall give the undersigned a copy of each notice of any default it sends to Tenant under said Lease, shall accept cure of such default by the undersigned within thirty (30) days of the undersigned's receipt of such notice (except for the payment of rent which shall be cured within ten [10] days after receipt of notice) and shall not hinder or impair any effort by the undersigned to enter and possess the Leased Premises for the then unelapsed portion of the term of the Lease upon all of the provisions of the Lease.

All notices sent to the undersigned pursuant to the provisions of this Guaranty shall be in writing and sent via United States certified or registered mail to the following address:

> Walgreen Co.
> 200 Wilmot Road
> Deerfield, IL  60015
> Attn:  Law Department

provided, however, that the undersigned may designate a future or different address to which subsequent notices shall be sent.  Notice shall be deemed given upon receipt or upon refusal to accept delivery.  Notwithstanding the foregoing, Walgreen Co. shall not be entitled to a copy of the default notice or an additional period in which to cure such default, if the Tenant is a subsidiary corporation (or an affiliate corporation) of Walgreen Co.

In the event of litigation between Landlord and the undersigned in connection with this Guaranty, the reasonable attorneys' fees and court costs incurred by the party prevailing in such litigation shall be borne by the non-prevailing party.

The undersigned hereby waives all so-called suretyship defenses.

**Page 1 of 2**

This Guaranty shall be binding upon the successors and assigns of the undersigned and shall inure to the benefit of the heirs, legal representatives, successors and assigns of the Landlord.

In Witness Whereof, the undersigned has executed and delivered this instrument, under seal, the ____27____ day of ____July____, 1992.

WALGREEN CO.
(an Illinois corporation)

Witnesses:

_L.K. Merten_

_Theodore A. Ballat_

By: _____
        Vice President

Attest:

_____
Assistant Secretary

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF LAKE       )

I, _Anthony C. Sgarlata_, a Notary Public, do hereby certify that _J. W. Burgauer_, personally known to me to be the Vice President of WALGREEN CO., an Illinois corporation, and _Allan M. Resnick_, personally known to me to be the Assistant Secretary of said corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that as such Vice President and Assistant Secretary, they signed and delivered the said instrument as Vice President and Assistant Secretary of said corporation, and caused the corporate seal of said corporation to be affixed thereto, pursuant to authority, given by the Board of Directors of said corporation as their free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

Given under my hand and notarial seal, this _27_ day of _July_, 1992.

My Commission Expires:

_____
Notary Public

Page 2 of 2

```
"OFFICIAL   SEAL"
ANTHONY C. SGARLATA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/12/95
```

LYNN.SND/347
8/04/92

## SUBORDINATION AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT made in multiple copies as of the _____ day of
_____, 1992, by and between EASTLAND SAVINGS
BANK, a Rhode Island banking corporation ("Mortgagee") and
WALGREEN EASTERN CO., INC., a New York corporation
("Tenant");

W I T N E S S E T H :

WHEREAS, by Ground Lease dated July 27, 1992 ("said
Lease"), GORDON HALL III AND JOHN RYDER, as Trustees of
MAOLIS REALTY TRUST, under Declaration of Trust dated
September 24, 1979, and registered with the Essex County,
Southern District of the Land Court, as Document No. 172007,
as landlord ("Landlord"), leased to Tenant, as tenant, the
property legally described on attached Exhibit "A";

WHEREAS, Mortgagee is the holder of a certain Note in
the principal amount of $_____, secured by a Mortgage
dated _____ by Landlord, recorded on
_____, as Document No. _____, in the Official
Records of _____ County, Massachusetts ("said
Mortgage"), covering the property legally described on
attached Exhibit "A" ("Leased Premises");

WHEREAS, Mortgagee and Tenant desire to confirm their
understanding with respect to said Lease and said Mortgage;

NOW, THEREFORE, in consideration of the Premises and
the mutual covenants and promises contained herein and other
good and valuable consideration, the parties agree as
follows:

1.    Said Mortgage is hereby subordinate and inferior to
said Lease and to the leasehold estate created by said Lease
and to all of Tenant's rights thereunder.

2.    Tenant agrees to use good faith efforts to send to
Mortgagee a copy of all Landlord default notices sent to
Landlord pursuant to said Lease.  Mortgagee shall have the
right to cure such Landlord defaults during the same time
period granted Landlord under said Lease.

3.    Mortgagee shall not be bound by any modification
made to said Lease without Mortgagee's written consent.

4.    This Agreement shall also bind and benefit the
heirs, legal representatives, successors and assigns of the
respective parties hereto, and all covenants, conditions and
agreements herein contained shall be construed as running
with the land.

(This Instrument prepared by Anthony C. Sgarlata, 200 Wilmot
Road, Deerfield, Illinois  60015)

Exhibit "D"

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement, under seal, as of the day and year first above written.

WALGREEN EASTERN CO., INC.    EASTLAND SAVINGS BANK


By_____    By_____
        Vice President                Vice President


Attest:                       Attest:


_____  _____
     Assistant Secretary              Secretary

Witnesses:                    Witnesses:


_____  _____


_____  _____


STATE OF NEW YORK    )
                     )SS
COUNTY OF _____ )

On this ___ day of _____, 19___, before me appeared _____ and _____, to me personally known, who, being by me duly sworn, did say that they are the Vice President and Assistant Secretary of WALGREEN EASTERN CO., INC., and that the seal affixed to said instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of its board of directors and said Vice President and Assistant Secretary acknowledged said instrument to be the free act and deed of said corporation.


                              _____
                              (Signature)


                              _____
                              (Title)

            My commission expires:_____)


COMMONWEALTH OF MASSACHUSETTS )
                             )SS
COUNTY OF _____ )

On this ___ day of _____, 19___, before me appeared _____ and _____, to me personally known, who, being by me duly sworn, did say that they are the Vice President and Secretary of EASTLAND SAVINGS BANK, and that the seal affixed to said instrument is the corporate seal of said corporation, and that said instrument was signed and sealed in behalf of said corporation by authority of its board of directors and said Vice President and Secretary acknowledged said instrument to be the free act and deed of said corporation.


                              _____
                              (Signature)


                              _____
                              (Title)
            My commission expires:_____

# EXHIBIT B

TARLOW BREED
HART & RODGERS, P.C.
*Counsellors at Law*

**NOTICE OF DEFAULT**
**DEMAND FOR CURE**

April 26, 2005

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Walgreen Eastern Co., Inc.
1417 Lake Cook Road
Deerfield, Illinois 60015
Attn: Law Department

Re:  Lease with Maolis Realty Trust
      Walgreen's Store # 2716
      Lynn, Massachusetts

Ladies and Gentlemen:

     Reference is made to that certain lease dated July 27, 1992, as amended, by and between
Walgreen Eastern Co., Inc., as tenant ("Tenant"), and Maolis Realty Trust, as landlord
("Landlord") with respect to certain demised premises at the above referenced location. Said
lease is hereinafter referred to as "the Lease".

     Tenant is in default of the Lease in that Tenant has failed:

     (i)      to pay to Landlord the additional charges due under the Lease for CAM
              and insurance for the calendar year 2004, in the aggregate amount of
              $12,284.67 (please see the attached letter to Mr. Ishmael Nepomunceno
              dated February 14, 2005).

     (ii)     to pay in full the monthly CAM and insurance escrow amount for each of
              the months of January through April 2005, for a total underpayment of
              $4,094.88 (please see the attached letter to Mr. Ishmael Nepomunceno
              dated February 14, 2005).

---

101 Huntington Avenue ▪ Boston, MA 02199 ▪ Telephone 617.218.2000 ▪ Fax 617.261.7673 ▪ www.tbhr-law.com

Walgreen Eastern Co., Ir
April 26, 2005
Page 2

   Pursuant to Article 19 of the Lease, in the event Tenant shall fail to cure said defaults within thirty (30) days of the date hereof, Landlord may, at any time thereafter, during the continuance of such default, terminate the Lease and re-enter the demised premises by summary proceedings or otherwise, all as set forth in said Article 19. Notwithstanding any such termination of the Lease Tenant shall remain liable for all rent and other charges reserved in the Lease to be paid.

   **Partial cure of any default and/or the cure of only some defaults shall not constitute a cure whatsoever of any default not cured in full. All rights, remedies and causes of action of Landlord including, but not limited to the right of termination reserved to it in the Lease are hereby expressly reserved. Nothing herein shall be deemed an exclusion, waiver or limitation of any fact, right or claim whatsoever, whether or not stated hereinabove.**

   I urge you promptly to cure your defaults in order that it will not be necessary to pursue this matter further.

                                        Yours truly,

                                        Geoffrey Norman, Attorney for
                                        Maolis Realty Trust

GEN/ksl
Cc: Mr. Jack Ryder
    Mr. Gordon Hall

# EXHIBIT C

*Walgreens*

May 6, 2005

Tarlow, Breed, Hart, & Rodgers, P.C.
Attn: Goeffrey Norman
101 Huntington Avenue
Boston, MA 02199

RE:      Notice of Default - Walgreens store #2716 – Union Plaza, Lynn, MA

Dear Mr. Norman,

I am in receipt of your default notice dated April 26, 2005 received in our office May 2, 2005 for the above referenced location. Please be advised that Walgreens is not in default of its obligations under the lease.

Your letter states that there is a balance due of $16,379.55 for 2004 CAM and Insurance and 2005 CAM and Insurance Escrow shortfalls. Please be advised that the 2004 CAM billing has been received and is being processed. Upon completion, payment will be made.

Please not that there is still a discrepancy concerning the payment of charges relating to Olga Vasquez. We have talked on several occasions regarding this matter. During our last conversation, you stated that you would get back to me after speaking to the Landlord. I still have not heard back from you. Walgreens proposed that we reimburse 2/3 of the cost of Ms. Vasquez' charges. This is due to the fact that part of her job function consists of items that Walgreens disputes, such as putting carriages back in the store, monitoring and coordinating snow removal during winter storms, and cleaning interior common areas, hallways, and bathrooms. We have discussed our reasoning for these deletions in our phone conversations.

Please advise as to your clients response to Walgreens most recent offer of 2/3 payment for Ms. Vasquez' charges. We are not disputing the entire charge, only the portions which Walgreens is not obligated for per the Lease Agreement.

If you should have any questions, I may be reached at 847-964-4331.

Sincerely,

Mary Kasch
Rent Accountant

cc: Rob Silverman – Law Dept.

# EXHIBIT D



# TARLOW BREED
# HART & RODGERS, P.C.
*Counsellors at Law*

**NOTICE OF DEFAULT**
**DEMAND FOR CURE**

May 12, 2005

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Walgreen Eastern Co., Inc.
1417 Lake Cook Road
Deerfield, Illinois 60015
Attn: Law Department

Re:  Lease with Maolis Realty Trust
      Walgreen's Store # 2716
      Lynn, Massachusetts

Ladies and Gentlemen:

Reference is made to that certain lease dated July 27, 1992, as amended, by and between Walgreen Eastern Co., Inc., as tenant ("Tenant"), and Maolis Realty Trust, as landlord ("Landlord") with respect to certain demised premises at the above referenced location. Said lease is hereinafter referred to as "the Lease".

Tenant is in default of the Lease in that Tenant has failed:

        (i)      to pay to Landlord the additional charges due under the Lease for CAM for the calendar years 2001 ($9,644.40), 2002 ($10,258.69) and 2003 ($10,753.60), in the aggregate amount of $30,656.69.

        (ii)     to pay in full the monthly CAM and insurance escrow amount for the month of May 2005, being an underpayment of $1,023.72.

Pursuant to Article 19 of the Lease, in the event Tenant shall fail to cure said defaults within thirty (30) days of the date hereof, Landlord may, at any time thereafter, during the continuance of such default, terminate the Lease and re-enter the demised premises by summary proceedings



Walgreen Eastern Co., Inc.
May 12, 2005
Page 2

or otherwise, all as set forth in said Article 19. Notwithstanding any such termination of the Lease Tenant shall remain liable for all rent and other charges reserved in the Lease to be paid.

**Partial cure of any default and/or the cure of only some defaults shall not constitute a cure whatsoever of any default not cured in full. All rights, remedies and causes of action of Landlord including, but not limited to the right of termination reserved to it in the Lease are hereby expressly reserved. Nothing herein shall be deemed an exclusion, waiver or limitation of any fact, right or claim whatsoever, whether or not stated hereinabove.**

This Notice of Default and Demand for Cure is given in addition to (and not in replacement of) the earlier and presently outstanding Notice of Default and Demand for Cure dated April 26, 2005.

I urge you promptly to cure your defaults in order that it will not be necessary to pursue this matter further.

Yours truly,

Geoffrey Norman, Attorney for
Maolis Realty Trust

GEN/ksl
Cc: Mr. Jack Ryder
    Mr. Gordon Hall

# EXHIBIT E

# TARLOW BREED
# HART & RODGERS, P.C.
*Counsellors at Law*

## TERMINATION NOTICE & NOTICE TO QUIT

June 1, 2005

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Walgreen Eastern Co., Inc.
200 Wilmot Road
Deerfield, Illinois 60015
Attn: Law Department

### SERVICE BY CONSTABLE

Walgreen Eastern Co., Inc.
c/o Prentice-Hall Corporation System
84 State Street
Boston, MA 02109

RE:    Termination Notice
       14 Day Notice to Quit
       Walgreen's Store # 2716
       Lynn, Massachusetts

A SERIES OF TRUE COPIES, ATTEST

*Preston M. Malkofsky*

CONSTABLE

Dear Ladies and Gentlemen:

This notice will serve to notify you that since you have not cured the defaults set forth in that Notice of Default dated April 26, 2005, the lease dated July 27, 1992, between Maolis Realty Trust, as landlord ("Landlord") and Walgreen Eastern Co., Inc., as tenant ("Tenant") is hereby terminated and you now occupy the above captioned premises as a tenant at sufferance.

Tenant is now requested by Landlord to leave the premises. You have fourteen (14) days from receipt of this notice to leave or Landlord will go to court and seek permission to evict you.

By law, a court is the final authority in every eviction, and if you believe Tenant is entitled to remain in the premises, you or your lawyer may present your case in court.



Walgreen Eastern Co., Inc.
June 1, 2005
Page 2

The reason that Landlord wishes to end your occupancy at the premises is that you have failed to cure the defaults set forth in that Notice of Default sent to you on April 26, 2005.

Any acceptance of any payments after this date by Landlord shall be for use and occupancy only, and shall not in any way signify the acceptance of any tenancy.

Cordially,

Geoffrey E. Norman, Attorney For
And On Behalf Of
Maolis Realty Trust

GEN/kl
Cc: Maolis Realty Trust

📥JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Walgreen Eastern Co., Inc.

**DEFENDANTS**

Maolis REalty Trust

**(b)** County of Residence of First Listed Plaintiff Lake County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    Essex County, MA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Joel G. Beckman
Nystrom Beckman & Paris LLP
10 St. James Avenue, 16th Flr, Boston MA
02116 (617) 778-9100

Attorneys (If Known)
Geoffrey E. Norman
Tarlow Breed Hart Murphy & Rodgers PC
101 Huntington Avenue, Suite500
Boston MA 02199 (617) 218-2019

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | DEF | | | DEF |
|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place  ☐ 4 | ☒ 4 |
| | | | of Business In This State | |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place  ☒ 5 | ☐ 5 |
| | | | of Business In Another State | |
| Citizen or Subject of a | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |
| Foreign Country | | | | |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIW C/DIW W (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee |
| ☒ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

(Cite the U.S.Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

28 USC Section 1332

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
In excess of 1.2 million

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See
instructions):

JUDGE  J. Tauro

DOCKET NUMBER  05-11541 JLT

DATE  7/29/05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #         AMOUN         APPLYING IFP         JUDGE         MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Walgreen Easteen Co., Inc  V. Maolis  Realty Trust

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☐ II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.     for patent, trademark or copyright cases

☒ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in     notice of
this district please indicate the title and number of the first filed case in this court.     Removal
Maolis Realty Trust V Wagreen Easken Co. (05- 11541 JLT)

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐     NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

YES ☐     NO ☒

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐     NO ☒

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐     NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☐     NO ☒

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☐     Central Division ☐     Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☒     Central Division ☐     Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐     NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Joel G. Beckman
ADDRESS Nystean Beckman & Paris, LLP, 10 St. James Ave, 16th Flr, Boston, MA 02116
TELEPHONE NO. (617) 778-9100

(Coversheetlocal.wpd - 10/17/02)